# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 23, 2008

Charles R. Fulbruge III
Clerk

No. 06-11235

LAWRENCE R POLINER, MD; LAWRENCE R POLINER, MD, PA

Plaintiffs-Appellees

v.

TEXAS HEALTH SYSTEMS, a Texas Non-Profit Corporation, doing business as Presbyterian Hospital of Dallas; JAMES KNOCHEL, MD

Defendants-Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal brings to us a judgment awarding some $33 million, including prejudgment interest, against a major hospital and leading physician for alleged defamations. As we will explain, this extraordinary judgment rests on limited restrictions of Dr. Lawrence Poliner's privileges at Presbyterian Hospital over a period of fewer than twenty-nine days to investigate concerns involving his handling of several patients. This peer review, which was headed by Dr. James Knochel, led to a suspension of Poliner's cardiac catheterization lab and echocardiography privileges that lasted approximately five months. Poliner sued Knochel, Presbyterian, and other doctors involved in the peer review alleging

various federal and state law violations. The district court found that the suspension enjoyed immunity from money damages under the federal Health Care Quality Improvement Act (HCQIA),[1] and granted a partial summary judgment. But the court concluded that whether the temporary restrictions of privileges during the investigation enjoyed immunity from money damages presented questions for a jury.

The case proceeded to trial solely on the temporary restrictions of privileges. The jury found for Poliner on his defamation claims.[2] Poliner was able to offer evidence at trial of actual loss of income of about $10,000—but was awarded more than $90 million in defamation damages, nearly all for mental anguish and injury to career. The jury also awarded $110 million in punitive damages. The district court ordered a remittitur of the damages and entered judgment against Defendants. We hold that Defendants are immune under the HCQIA from money damages for the temporary restrictions of Poliner's privileges. We reverse and render judgment for Defendants.

I. Facts and Proceedings Below

A.

On May 12, 1998, Patient 36 presented in Presbyterian's emergency room with chest pains, and he was referred to Dr. Lawrence Poliner, an interventional cardiologist who had a solo practice at Presbyterian Hospital. Diagnostic tests indicated that the patient was suffering from a heart attack, and that the patient's right coronary artery (RCA) was partially blocked. Poliner performed a procedure to open the artery. However, Poliner made a diagnostic mistake: the patient's left anterior descending artery (LAD) was completely blocked, and

---

[1] See 42 U.S.C. § 11101 et seq.

[2] The jury also found for Poliner on his breach of contract, business disparagement, interference with contractual relations, and intentional infliction of emotional distress claims. Poliner elected to recover under the defamation theory after trial.

Poliner missed it. Another doctor, Dr. Tony Das, saw the LAD on a monitor in the control room. Poliner learned that he missed the LAD sometime after completing the procedure. Das spoke to him about the procedure and the LAD. Dr. Charles Levin, the director of the catheterization lab, heard that day that Poliner had performed an emergency procedure. He reviewed the patient's films, and then spoke with Poliner.

In an addendum to the chart, Poliner admitted that he missed the totally blocked LAD. He wrote that "[i]n reviewing the films, it is apparent that the left anterior descending coronary artery is totally occluded," and that "[a]t the time that this study was done and visualizing the anatomy in the laboratory from the video, this was not apparent, but it is obvious from reviewing the films." Poliner indicated that he might have treated the LAD before the RCA had he seen it.

Patient 36 also suffered post-procedure complications. The patient suffered internal bleeding and eventually went into shock, deteriorating to the point that a critical care specialist, Dr. Kenney Weinmeister, was brought in. Weinmeister testified that the patient was suffering from "severe metabolic acidosis," which "was due to what we call hypovolemia or essentially blood loss so that he didn't have enough fluid in his vessels to maintain blood pressure, and that was due to a retroperitoneal hemorrhage or bleeding." The patient was, in his words, "near respiratory failure." Weinmeister testified that, had he not intervened, the patient could have died within an hour. Poliner was in the ICU a number of times following the patient's procedure. There were problems contacting Poliner, although at trial there was testimony that he tried to call the ICU several times but he could not get through. Poliner also sent his wife, who is a nurse, over to check on the patient. As the patient's condition deteriorated in the afternoon, Poliner was not present. There was evidence at trial that he had another procedure scheduled that afternoon, but the time line is not entirely

clear. Dr. John Harper, the chief of cardiology, was told about Patient 36 on May 12, and he reviewed the patient's chart and films.

Dr. James Knochel, the chairman of the Internal Medicine Department (IMD), learned about Patient 36 from Das and Weinmeister the next day, May 13.[3] This, however, was not the first of Poliner's patients to come to Knochel's attention. Cardiology was part of the IMD, and four of Poliner's other patients—Patients 3, 9, 10, and 18—had been referred by the hospital's Clinical Risk Review Committee (CRRC) to Knochel and the Internal Medicine Advisory Committee (IMAC), which Knochel chaired, for review.[4]

---

[3] The trial testimony is somewhat unclear about what exactly Knochel knew on May 13 about the post-procedure care Patient 36 received. Knochel and Weinmeister testified that they spoke about the patient. Weinmeister testified that he told Knochel about his concerns regarding Patient 36's post-procedure problems, while Knochel suggested in his testimony that he may not have been aware of all of the post-procedure problems.

[4] Generally, when an incident occurred at Presbyterian, including something relating to patient care, a Committee Event Report Form (CERF) would be completed. The CERF was sent to the hospital's risk management department for processing. If the event involved clinical issues, the CERF was forwarded to the CRRC. The CRRC would review the incident, and if the committee had concerns, it would forward the case to the relevant department for further review. When an incident involved the IMD, Knochel would receive the referral from CRRC, and the IMAC would assist in determining whether the patient had received acceptable care.

Poliner's care of Patients 3,[5] 9,[6] 10,[7] and 18[8] involved different issues of varying degrees of concern, but in each case, his medical judgment had been questioned and, to some extent, criticized.[9] Although Patient 10 had been reviewed and cleared by the IMAC in March 1997, the other cases were of recent vintage. The CRRC referred Patients 3 and 18 to the IMD in early 1998. Knochel asked a cardiologist to review each case, and the IMAC considered the cases at the end of April. The CRRC referred Patient 9 to the IMD in April.

---

[5] In December 1997, Poliner treated Patient 3. The issue here was Poliner's decision to re-use a sheath site for a second procedure after the nurses expressed concern that the site may have been contaminated by urine and blood. Poliner wanted to preserve the other sheath site in case another procedure was required.

[6] Poliner treated Patient 9 in October 1997. The procedure performed by Poliner was not questioned, but other treatment decisions were. There were concerns about the amount of blood thinner ordered pre-procedure, as well as orders for additional blood thinner and another drug post-procedure. At approximately 2:00 a.m., the patient was experiencing stroke-like symptoms. A nurse called Poliner, and he ordered a platelet infusion. Poliner did not then return to Presbyterian to evaluate the patient, although there may have been little else he could have done at the time. Nor did he order a CT scan or request a neurological consult. Poliner returned to the hospital in the morning and requested the neurological consult. The patient subsequently had CT scans and underwent surgery later in the day. The case involved several nursing errors as well.

[7] Poliner performed a catheterization on Patient 10 in the fall of 1996. The patient had shellfish and Betadine allergies. There were concerns at the time that a shellfish allergy was predictive of an allergy to iodine-containing contrast dye that was used in catheterizations. The patient refused to be pretreated with Benadryl. Poliner decided to proceed with the procedure. The patient developed a rash, although it is unclear whether the contrast-dye in fact caused the rash. The primary concern was Poliner's decision to proceed with the procedure without any allergy pretreatment.

[8] Patient 18, an 88-year-old woman, presented in the emergency room with a heart attack in September 1997. She was referred to Poliner, and he decided to perform a catheterization. The patient died during the procedure. The primary issue was whether it was appropriate to attempt the procedure or whether she should have been treated medically.

[9] One other case discussed at trial involved a mistake Poliner made during a catheterization. Poliner accidentally threaded a catheter through Patient 39's vein instead of the artery. The primary concern was not that Poliner initially entered the vein by accident, but that it took him too long to realize the mistake; indeed, the catheter reached the patient's heart. The parties dispute whether this case factored into Knochel's decision, but for our purposes, it does not matter whether it did or not.

Levin completed a review of the case sometime before May 13, although the IMAC had yet to take up the case. It was against this backdrop that Knochel learned of Patient 36. Knochel consulted with Harper, Levin, various hospital administrators and the members of the IMAC on May 13, and decided that he would seek an abeyance—a temporary restriction—of Poliner's cath lab privileges to allow for an investigation as provided for in the Medical Staff bylaws.[10]

Late on May 13, Knochel met with Poliner, Harper, and Levin, and asked Poliner to agree to the abeyance. When Poliner asked what his options were, Knochel told him that the alternative was suspension of his privileges.[11] The abeyance letter was delivered to Poliner the next afternoon, May 14, and Knochel asked Poliner to sign and return it by 5:00 p.m. The letter advised Poliner that Patient 36 was the catalyst, and that Patients 3, 9, and 18 had also been referred by the CRRC to the IMD. The letter explained that Knochel was going to appoint an ad hoc committee of cardiologists to conduct a review, and that Poliner would have the opportunity to meet with Knochel and the IMAC to respond to any concerns raised by the committee that could lead to corrective action prior to the action being taken. Poliner requested more time so he could

---

[10] Presbyterian's Medical Staff bylaws provide that
[w]henever the activities or professional conduct of any physician are of such concern that in the assessment of the department chairman, vice-chairman, or advisory committee, further evaluation of the activities or professional conduct is necessary, the department chairman, vice-chairman, or advisory committee may hold certain clinical privileges of the physician in abeyance for a period of up to fifteen (15) days (the initial action) while additional review is performed. Such action shall be known as Abeyance. The physician must agree to the abeyance prior to the taking of such action. If the physician does not agree to the abeyance, the department will proceed with the corrective action or suspension.

[11] The bylaws allow for a summary suspension of clinical privileges "when the acts of a practitioner through his lack of competence, impaired status, behavior or failure to care adequately for his patients constitutes a present danger to the health of his patients."

consult a lawyer, but Knochel declined. Poliner signed the abeyance request. Poliner subsequently engaged legal counsel.

Knochel immediately appointed an ad hoc committee of six cardiologists to review a sample of Poliner's cases. The committee reviewed 44 cases, and concluded that Poliner gave substandard care in more than half. The IMAC met on May 27, the thirteenth day of the abeyance, to consider the ad hoc committee report, and recommended conducting additional reviews of echocardiograms and obtaining an outside review. The IMAC also recommended extending the abeyance of Poliner's cath lab privileges as provided for in the bylaws.[12] Knochel had a letter hand delivered to Poliner requesting his consent to the extension. The letter advised Poliner that the extension was investigational in nature and that the ad hoc committee had reviewed 44 of his cases. The letter also stated that Poliner would have an opportunity to meet with the IMAC to respond to the ad hoc committee review. Knochel again told Poliner that the alternative to abeyance was a suspension. Poliner signed the extension request on May 29.

A meeting of the IMAC was scheduled for June 11. On June 8, Knochel sent Poliner a letter advising him of the June 11 meeting and asking him to attend the meeting. Knochel provided Poliner with a list of the patients that had been reviewed and the comments of the reviewers, and told him that the patient records would be available to him. Poliner requested that the June 11 meeting be delayed to allow him more time to review the patients' files, but his request was denied and the meeting was held as scheduled. The day after the meeting, June 12, the IMAC agreed unanimously that Poliner's cath lab and echocardiography privileges should be suspended.[13]

---

[12] The bylaws provide, "The department chairman, vice-chairman or advisory committee may extend the abeyance for an additional fourteen (14) days."

[13] As will be seen, the district court later granted summary judgment to all defendants participating in this suspension of privileges after finding immunity under federal law. It was from this unchallenged grant of summary judgment that Poliner tacked to the argument that

An addendum to the IMAC meeting minutes reflects the following concerns about Poliner: (1) poor clinical judgment; (2) inadequate skills, including angiocardiography and echocardiography; (3) unsatisfactory documentation of medical records; and (4) substandard patient care. Knochel accepted the recommendation of the IMAC and suspended Poliner's cath lab and echocardiography privileges on June 12.

On July 10, Poliner requested a hearing on the June 12 suspension. Although he had a right to an expedited hearing under the bylaws, and the letter informing Poliner of his suspension advised him so, Poliner did not request an expedited hearing.[14] The hospital notified Poliner on August 14 that a hearing had been set for September 14, and identified who would be on the Hearing Committee. On August 19, Poliner requested a continuance. On October 5, the hospital notified Poliner that the hearing had been rescheduled for the first week of November, as Poliner had apparently requested.

The hearing was held as re-scheduled, and on November 9, the Hearing Committee issued its recommendations. The Committee concluded that the June 12 suspension should be upheld based on the evidence that was available at the time of the suspension but that Poliner's privileges should be reinstated with a condition.[15] Presbyterian's Medical Board accepted the Committee's

---

the temporary restriction of privileges during the investigation was distinct from the June 12 suspension.

[14] It is unclear from the bylaws whether the suspended physician must specifically request the expedited hearing or is entitled to it as of right. The bylaws state that "a hearing for a practitioner who is under suspension which is then in effect shall be held as soon as arrangements may reasonably be made, but not later than ten (10) days from the date of receipt of such petitioner's request for hearing." The bylaws then provide, "A physician under suspension who requests an expedited hearing shall have waived his right to the 30-day hearing notice requirement." This uncertainty is of no moment.

[15] Specifically, the Hearing Committee recommended that "Poliner should be required to have a mandatory consultation with another cardiologist on staff who has interventional cardiology privileges in the Cardiac Cath Lab. Consultation should be for concurrence with documented indications for the selected procedure to be performed prior to the procedure." The

recommendations. Poliner appealed the Medical Board's decision to uphold the June 12 suspension to Presbyterian's Committee on Professional Affairs (CPA). The appeal was limited to determining whether Poliner had substantially received the procedural due process provided for in the bylaws. The CPA determined he had, and Presbyterian's Board of Trustees upheld that decision.

B.

In May 2000, Poliner and his professional association sued Knochel, Harper, Levin, Presbyterian, and other doctors who had been involved in the peer review process. Poliner brought federal antitrust claims as well as state antitrust, Deceptive Trade Practices Act, and numerous tort claims. Defendants moved for summary judgment on, among other grounds, immunity under the HCQIA. On September 30, 2003, the district court issued its decision.

In analyzing HCQIA immunity, the district court concluded that there were two peer review actions, the May 14 abeyance and June 12 suspension. The court held, as to the May 14 abeyance, that fact questions precluded summary judgment. The court found a fact issue as to whether Knochel's threat to summarily suspend Poliner if he did not agree to the abeyance vitiated Poliner's consent. If Poliner had not freely agreed, the court reasoned that the abeyance was then in fact a summary suspension. If this was so, the court concluded that there were fact issues as to whether Defendants satisfied the HCQIA's standards. Thus, the court denied HCQIA immunity, as well as state law immunity, to Knochel, Harper, Levin, and Presbyterian.

---

pre-procedure consultation was to apply to the first 30 patients "for which intervention is contemplated," at which point Harper was to review those 30 cases and "make a recommendation to Dr. Knochel about Dr. Poliner's clinical performance before unrestricted privileges are to be granted." Approximately a month after the Medical Board approved this condition, it changed the condition from pre-procedure consultation to post-procedure review of the first 30 cases. This review was to be conducted by an outside reviewer, who would also review at least 30 other comparable cases from other cardiologists, ostensibly for the purpose of comparison. The outside reviewer's conclusions would be given to the cardiology chief who would then make a recommendation to Knochel for further action.

The court ruled that the remaining defendants, who had served on the ad hoc committee and on the IMAC, were entitled to HCQIA and state law immunity. The court dismissed some of Poliner's claims but ruled that fact issues remained as to Poliner's remaining tort claims, including defamation, against Knochel, Harper, Levin, and Presbyterian.

The district court's summary judgment decision reshaped the case. As Poliner explained in his motion for leave to file a fourth amended complaint,

> The Court found that there was an issue of fact with respect to whether the May 14, 1998 Abeyance (the "Forced Abeyance") was in fact a de facto summary suspension. The Summary Judgment Ruling centers on the action of the Defendants in imposing the Forced Abeyance, shifting the majority of the focus of the case to the time period before and on May 14, 1998, when the Forced Abeyance was imposed. . . . Given the Summary Judgment Ruling and the Court's recent comments, it is clear that the focus of the case has shifted from an emphasis on the [June 12] Summary Suspension to an emphasis on the Forced Abeyance, a shift that the parties could not have reasonably foreseen. Now that such shift has occurred, Plaintiffs request leave to amend their Complaint for the purpose of conforming the complaint to the issues that the Court has indicated will be submitted to the jury.

Indeed, one of the amendments Poliner offered as an example in his motion was "add[ing] allegations regarding the Forced Abeyance that will allow the jury to decide whether or not the Forced Abeyance, in reality, was a summary suspension."

In a subsequent order, dated July 7, 2004, the district court clarified that Poliner could not recover any damages from the June 12 suspension: "Based on the Court's finding that all of the participants in the June 12, 1998 suspension were entitled to immunity, the Court finds that Plaintiffs are not entitled to recover damages flowing from that suspension." The order also stated that, "[i]n light of this ruling, the propriety of the [ad hoc committee's] review and the IMAC's recommendation is no longer at issue. Accordingly, evidence of malice

or the motive of any of the participants in the June 12, 1998 suspension is not relevant, nor is any evidence regarding the [ad hoc committee's] analysis of the patients' files examined."

## C.

After four years of litigation, Poliner's trial theory tracked this new course: he was forced to agree to the abeyances, the consequence of which was that Knochel had summarily suspended him. This mattered, he said, because, under the Medical Staff bylaws, a summary suspension was allowed when a doctor posed a "present danger to the health of his patients," and he posed no such danger. Rather, Poliner suggested that he was suspended because his solo practice was a competitive threat to the dominant cardiology groups at Presbyterian, that Knochel "had it in for" him.

The trial evidence largely focused on the propriety of Poliner's treatment of Patients 3, 9, 10, 18, 39, and especially 36, and whether the mistakes Poliner had made rendered him a "present danger." Consistent with the court's July 7 order, the jury was not told about the ad hoc committee's conclusions and the IMAC's responses, although the jury was told that there was an investigation, that Poliner was summarily suspended on July 12, and that after the November hearing, his privileges were reinstated.

During the charge conference, the district court raised the issue of whether the abeyance period involved one or two peer review actions, and eventually decided to charge the jury that the May 14 abeyance and the extension of the abeyance were separate peer review actions.

The case was submitted to the jury, which found for Poliner on all of his remaining claims. The jury awarded in aggregate more than $360 million in damages, $90 million of which were for the defamation claims. Almost all of the damages awarded were for mental anguish, injury to career, and punitive damages. Harper and Levin settled with Poliner after trial. Poliner elected to

recover under his defamation theory against Knochel and Presbyterian. The district court remitted the defamation damages to $10.5 million for injury to career, $10.5 million for mental anguish, and $1.5 million in punitive damages, and further ordered prejudgment interest, which totals over $11 million. Defendants appealed. Poliner cross-appealed but subsequently dismissed his appeal.

## II. Standard of Review

We review the denial of motion for judgment as a matter of law de novo.[16] A party is entitled to judgment as a matter of law when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[17] "In entertaining a Rule 50 motion for judgment as a matter of law the court must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence."[18] "Nonetheless, '[i]f the facts and inferences point so strongly and overwhelmingly in favor of the moving party that the reviewing court believes that reasonable jurors could not have arrived at a contrary verdict, then we will conclude that the motion should have been granted.'"[19]

## III. Health Care Quality Improvement Act

Congress passed the Health Care Quality Improvement Act because it was concerned about "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care," and because "[t]here is a national need to restrict the ability of incompetent physicians to move from State to State

---

[16] Palasota v. Haggar Clothing Co., 499 F.3d 474, 480 (5th Cir. 2007).

[17] Fed. R. Civ. P. 50(a).

[18] Ellis v. Weasler Eng'g, Inc., 258 F.3d 326, 337 (5th Cir. 2001).

[19] Dixon v. Wal-Mart Stores, Inc., 330 F.3d 311, 313-314 (5th Cir. 2003) (quoting Resolution Trust Corp. v. Cramer, 6 F.3d 1102, 1109 (5th Cir. 1993)).

without disclosure or discovery of the physician's previous damaging or incompetent performance."[20]  Congress viewed peer review as an important component of remedying these problems, but recognized that lawsuits for money damages dampened the willingness of people to participate in peer review.[21] Accordingly, Congress "grant[ed] limited immunity from suits for money damages to participants in professional peer review actions."[22]

When a "professional review action" as defined by the statute meets certain standards, the HCQIA provides that participants in the peer review "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action."[23]  The statute establishes four requirements for immunity:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken--
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

---

[20] 42 U.S.C. § 11101(1), (2).

[21] See Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 31 (1st Cir. 2002) ("Before passage of the HCQIA in 1986, threats of antitrust action and other lawsuits often deterred health care entities from conducting effective peer review.").

[22] Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996).

[23] 42 U.S.C. § 11111(a); see also id. §11151(9) (defining "professional review action"). The act includes exceptions for certain civil rights actions that are not at issue here.  See id. § 11111(a).

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).[24]

"The Act includes a presumption that a professional review [action] meets the standards for immunity, 'unless the presumption is rebutted by a preponderance of the evidence.'"[25] We agree with our sister circuits that the HCQIA's "reasonableness requirements were intended to create an objective standard of performance, rather than a subjective good faith standard."[26]

## A.

HCQIA immunity extends to "professional review actions." The Act defines a "professional review action" in part as

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.[27]

---

[24] Id. § 11112(a).

[25] Mathews, 87 F.3d at 633 (quoting 42 U.S.C. § 11112(a)).

[26] Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1323 (11th Cir. 1994); see also Singh, 308 F.3d at 32 ("Our sister circuits have uniformly applied all the sections of § 11112(a) as objective standards. We apply these objective standards here." (citations omitted)); Sugarbaker v. SSM Health Care, 190 F.3d 905, 912 (8th Cir. 1999) ("Further, we have held that the reasonableness requirements contained in section 11112(a) necessitate an objective inquiry."); Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1333 (10th Cir. 1996) ("Courts apply an objective standard in determining whether a peer review action was reasonable under 42 U.S.C. § 11112(a)."); Mathews, 87 F.3d at 635 ("We agree with our sister circuits that § 11112(a) imposes an objective standard."); Smith v. Ricks, 31 F.3d 1478, 1485 (9th Cir. 1994) (explaining that "the 'reasonableness' requirements of § 11112(a) were intended to create an objective standard, rather than a subjective standard"). We previously indicated in an unpublished opinion that the "reasonableness" requirements impose an objective standard. See Doe v. La. Psychiatric Med. Ass'n, No. 96-30232, 1996 WL 670414, at *3 (5th Cir. Oct. 28, 1996).

[27] 42 U.S.C. § 11151(9).

The jury was charged that the May 14 abeyance and the extension of the abeyance were both professional review actions. We agree.

Both restrictions on Poliner's cath lab privileges meet the substantive elements of this definition. While there could be no extension of the abeyance without the initial abeyance, the extension of the abeyance resulted from an independent decision that another period of restriction was needed. To put it differently, the May 14 abeyance and the extension, although imposing the same substantive restrictions, enjoyed distinct justification and in this sense independently limited Poliner's privileges.[28] Thus, we evaluate the abeyance and the extension separately for compliance with § 11112(a).

To be clear, the abeyances are temporary restrictions of privileges, and we use that terminology, which comes from the Medical Staff bylaws, in our discussion; but for the purposes of HCQIA immunity from money damages, what matters is that the restriction of privileges falls within the statute's definition of "peer review action," and what we consider is whether these "peer review actions" satisfy the HCQIA's standards, and not whether the "abeyances" satisfy the bylaws.

We deal with one other preliminary matter now. The decision to extend the abeyance was made after the ad hoc committee reported the results of its review to Knochel and the IMAC; however, because of the district court's pre-trial order of July 7, the jury did not learn of this. This does not impede our consideration of the evidence because the district court's summary judgment and

---

[28] Cf. Mathews, 87 F.3d at 634 ("The definition of 'professional review action' encompasses decisions or recommendations by peer review bodies that directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's privileges."); Mathews v. Lancaster Gen. Hosp., 883 F. Supp. 1016, 1027 (E.D. Pa. 1995) (explaining that "the term 'professional review action' refers to the decision that results from a review of the facts obtained"); Fobbs v. Holy Cross Health Sys. Corp., 789 F. Supp. 1054, 1065 (E.D. Cal. 1992) (explaining that the § 11112(a) standards "apply to discrete decisions, not to an ongoing course of conduct").

July 7 orders establish the relevant historical facts[29] and the propriety of the ad hoc committee review for HCQIA purposes. The district court found that the ad hoc committee members were entitled to HCQIA immunity, and more to the point, the ad hoc committee's review undergirded the grant of HCQIA immunity for the June 12 suspension. Neither of the orders has been challenged on appeal. They are the law of the case.

B.

We begin with whether each peer review action was taken "in the reasonable belief that the action was in the furtherance of quality health care." It is plain that they were by the controlling standards. Other circuits have explained, as relevant under the facts of this case, that "[t]he 'reasonable belief' standard of the HCQIA is satisfied if 'the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'"[30] "[T]he Act does not require that the professional review result in an actual improvement of the quality of health care,"[31] nor does it require that the conclusions reached by the reviewers were in fact correct.[32] It

---

[29] It is not clear whether the committee concluded that Poliner gave substandard care in 26 or 29 cases. Some evidence and the district court's summary judgment order states that it was 29 cases, while the minutes from the IMAC meeting on May 27 list 26 cases. For our purposes, it makes no difference whether the number is 26 or 29.

[30] Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 468 (6th Cir. 2003) (quoting Bryan, 33 F.3d at 1323).

[31] Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d 1026, 1030 (4th Cir. 1994); see also Meyers, 341 F.3d at 468 (same).

[32] See Imperial, 37 F.3d at 1030 ("But more importantly to the issue at hand, even if Imperial could show that these doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process.").

bears emphasizing that "the good or bad faith of the reviewers is irrelevant";[33] rather it is an objective inquiry in which we consider the totality of the circumstances.[34]

It is indisputable that Poliner's treatment of Patient 36 raised serious questions about what had happened and why. Missing the LAD was a critical diagnostic error, made all the more troubling by the fact that Das and Levin saw the LAD; indeed, Poliner described the LAD as obvious and clear in his addendum. The concerns that flow from the LAD are amplified by the problems with Poliner's other patients that had been brought to Knochel's attention. It was in relatively quick succession that Knochel was presented with separate cases that called into question Poliner's medical judgment. That Poliner had over 20 years of experience and an apparently clean record before these cases only serves to heighten the concern: why was this experienced physician now having these problems? On May 14, there was ample basis for concern.

The ad hoc committee's review, upon which the extension of the abeyance rested, speaks for itself. A group of six cardiologists reviewed 44 of Poliner's cases and concluded that he gave substandard care in more than half of the cases. We conclude that, as to both peer review actions, the belief that temporarily restricting Poliner's cath lab privileges during an investigation would further quality health care was objectively reasonable.

Poliner defends the jury's verdict by arguing that the evidence demonstrates that had Poliner "actually administered the purported 'care' demanded by the critics, he would have affirmatively endangered his patients." Setting aside the fact that the evidence is not so unequivocal, this argument suffers from two interrelated flaws. First, our inquiry focuses on the information

---

[33] Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 840 (3d Cir. 1999).

[34] Imperial, 37 F.3d at 1030.

available to Defendants when they made the critical decisions. Defendants did not have the benefit of post-hoc expert analyses at that time.[35] Second, this focuses on whether Defendants' beliefs proved to be right. But the statute does not ask that question; rather it asks if the beliefs of Poliner's peers were objectively reasonable under the facts they had at the time.[36] If a doctor unhappy with peer review could defeat HCQIA immunity simply by later presenting the testimony of other doctors of a different view from the peer reviewers, or that his treatment decisions proved to be "right" in their view, HCQIA immunity would be a hollow shield.

Poliner's urging of purported bad motives or evil intent or that some hospital officials did not like him provides no succor. We have serious doubts that Poliner proved that the restrictions resulted from anti-competitive motives, and more to the point, the inquiry is, as we have explained, an objective one.

---

[35] See Singh, 308 F.3d at 41 (explaining that "[t]he appropriate 'inquiry is whether the decision was reasonable in light of the facts known at the time the decision was made, not in light of facts later discovered" (quoting Sklaroff v. Allegheny Health Educ. Research Found., No. Civ. A. 95-4758, 1996 WL 383137, at *9 (E.D. Pa. July 8, 1996))); Sugarbaker, 190 F.3d at 916-17 (explaining that expert opinions prepared for litigation did not rebut the presumption because the opinions were not known at the time the peer review action was taken).

[36] See Lee v. Trinity Lutheran Hosp., 408 F.3d 1064, 1071 (8th Cir. 2005) ("Even if Dr. Lee could show that 'the [peer review actions] reached an incorrect conclusion . . . [that] does not meet the burden of contradicting the existence of a reasonable belief that [the hospital] w[as] furthering health care quality.'" (quoting Sugarbaker, 190 F.3d at 916)); Meyers, 341 F.3d at 469 n.5 ("Our review, however, is not directed at whether each of the complaints were undisputedly true, but whether Defendants acted reasonably in considering and relying upon them."); Sugarbaker, 190 F.3d at 913 (explaining that such an argument "miss[es] the mark" because "[t]he focus of our inquiry is not whether the Executive Committee's initial concerns ultimately proved to be medically sound"); Mathews, 87 F.3d at 636 n.9 ("While the conflicting reports raise an issue of fact as to whether Mathews provided acceptable care, they do not call into question whether the Board's decision in relying on the Wilson report was reasonable.").

Our sister circuits have roundly rejected the argument that such subjective motivations overcome HCQIA immunity,[37] as do we.

C.

"The HCQIA does not require the ultimate decisionmaker to investigate a matter independently, but requires only a 'reasonable effort to obtain' the facts."[38] We consider "the totality of the process leading up to" the professional review action.[39]

No reasonable jury could conclude that Defendants failed to make a "reasonable effort to obtain the facts." Prior to May 14, Patients 3, 9, and 18 had been reviewed by the CRRC, which identified the care issues involved and forwarded the cases to Knochel. Each of these cases was reviewed by a cardiologist for Knochel and the IMAC. As to Patient 36, Knochel spoke with Weinmeister, Das, Levin, and Harper. Levin reviewed the films and spoke with Poliner briefly about the case, while Harper reviewed the patient's chart and films. Das saw the LAD while the procedure was occurring and spoke with Poliner. Weinmeister had treated the patient post-procedure. And, as to the abeyance extension, Knochel relied on the review of 44 cases conducted by the ad hoc committee. As explained above, the district court's summary judgment established the propriety of the ad hoc committee review, and that remains

---

[37] See, e.g., Sugarbaker, 190 F.3d at 914 ("In the HCQIA immunity context, the circuits that have considered the issue all agree that the subjective bias or bad faith motives of the peer reviewers is irrelevant."); Mathews, 87 F.3d at 635 (explaining that other circuits "have held that a defendant's subjective bad faith is irrelevant under § 11112(a) and have upheld a finding of immunity if, on the basis of the record, the court could conclude that the professional review action would further quality health care"); Bryan, 33 F.3d at 1335 ("Moreover, Bryan's 'assertions of hostility do not support his position [that the Hospital is not entitled to the HCQIA's protections] because they are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the [Hospital's] actions.'" (quoting Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992))).

[38] Gabaldoni v. Wash. County Hosp. Ass'n, 250 F.3d 255, 261 (4th Cir. 2001).

[39] Mathews, 87 F.3d at 637; see also Meyers, 341 F.3d at 469 (same).

unchallenged, for good reason. Knochel was entitled to rely on the information provided to him by the other doctors,[40] and there is nothing to suggest that the information was facially flawed or otherwise so obviously deficient so as to render Defendants' reliance "unreasonable."[41]

Poliner urges that omissions in the investigation and Knochel's admission at trial that further investigation was necessary before Poliner's privileges could be summarily suspended—that is, there was insufficient evidence to denominate Poliner a "present danger" under the bylaws—support the jury's findings that a "reasonable effort" was lacking. As to the former, Poliner was entitled to a reasonable effort, not a perfect effort.[42]

Poliner's latter argument is unavailing because HCQIA immunity is not coextensive with compliance with an individual hospital's bylaws. Rather, the statute imposes a uniform set of national standards. Provided that a peer review action as defined by the statute complies with those standards, a failure to comply with hospital bylaws does not defeat a peer reviewer's right to HCQIA immunity from damages.[43]

---

[40] See Gabaldoni, 250 F.3d at 261 (explaining that "it was permissible for the Board to rely on the reports and investigations of the various committees . . . in rendering its decision"); Bryan, 33 F.3d at 1335 (same).

[41] Cf. Brader, 167 F.3d at 843 (explaining that "the reports of Diamond and Ochsner were not so obviously mistaken or inadequate as to make reliance on them unreasonable").

[42] Singh, 308 F.3d at 43.

[43] See Meyers, 341 F.3d at 469-70 (rejecting an argument that failure to comply with hospital bylaws defeated immunity because "even assuming LMH did violate the bylaws, the notice and procedures provided complied with the HCQIA's statutory 'safe harbor'"); Ricks, 31 F.3d at 1487 n.8 (rejecting an argument that violations of state law and professional organization guidelines defeat HCQIA immunity "because once the immunity provisions of the HCQIA are met, defendants 'shall not be liable in damages under any law of the United States or of any State' based on a professional review action" (quoting § 11111(a)(1))); Bakare v. Pinnacle Health Hosps., Inc., 469 F. Supp. 2d 272, 290 n.33 (M.D. Pa. 2006) ("HCQIA immunity attaches when the reviewing body satisfies the requirements under HCQIA, regardless of its own policies and procedures.").

It bears emphasizing that this does not mean that hospitals and peer review committees that comply with the HCQIA's requirements are free to violate the applicable bylaws and state law. The HCQIA does not gainsay the potential for abuse of the peer review process. To the contrary, Congress limited the reach of immunity to money damages. The doors to the courts remain open to doctors who are subjected to unjustified or malicious peer review, and they may seek appropriate injunctive and declaratory relief in response to such treatment.[44] The immunity from money damages may work harsh outcomes in certain circumstances, but that results from Congress' decision that the system-wide benefit of robust peer review in rooting out incompetent physicians, protecting patients, and preventing malpractice outweighs those occasional harsh results; that giving physicians access to the courts to assure procedural protections while denying a remedy of money damages strikes the balance of remedies essential to Congress' objective of vigorous peer review.[45] The doctor may not recover money damages, but can access the court for other relief preventive of an abusive peer review. It is no happenstance that this congressional push of peer review came in a period of widespread political efforts at the state level to achieve tort reform and protect medical doctors from the debilitating threat of money damages. It would have been quixotic at best if those efforts were accompanied by tolerance of money damages suits by doctors

---

[44] Sugarbaker, 190 F.3d at 918; see also Singh, 308 F.3d at 44 ("HCQIA immunity only covers liability for damages. It does not shield covered defendants from suit and other forms of relief."); Imperial, 37 F.3d at 1031 (explaining that "the actual protection given by the Act is limited to damages"). To the extent we suggested otherwise in Doe, see 1996 WL 670414, at *4, we decline to follow, and are not bound by, that unpublished opinion, see 5th Cir. 47.5.4 (providing that "[u]npublished opinions issued on or after January 1, 1996, are not precedent").

[45] See Imperial, 37 F.3d at 1028 ("To assure that hospitals and doctors cooperate with the system and engage in meaningful professional review, Congress found it essential to provide qualified immunity from damages actions for hospitals, doctors, and others who participate in the professional review process.").

21

facing peer review—where tort reformers assured that discipline of doctors would be found.

D.

Section 11112(a)(3) imposes certain procedural requirements, namely that a peer review action is taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." Section 11112(b) provides a "safe harbor" set of procedures that, if given, means that the "health care entity is deemed to have met the adequate notice and hearing requirement." Finally, § 11112(c) provides,

> (c) Adequate procedures in investigations or health emergencies
>
> For purposes of section 11111(a) of this title, nothing in this section shall be construed as--
>
> (1) requiring the procedures referred to in subsection (a)(3) of this section--
>
> > (A) where there is no adverse professional review action taken, or
> >
> > (B) in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action; or
>
> (2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.

The peer review actions satisfy the HCQIA's procedural requirements.

The May 14 restriction falls squarely within § 11112(c)(1)(B)'s scope. The abeyance was a restriction of privileges that was imposed to allow for an investigation to determine whether other action, such as a suspension, was

necessary. Poliner urges that the provision does not apply because the restriction lasted for 15 days, one day longer than is permissible. We are not persuaded. The ad hoc committee completed its review and reported its results to Knochel and the IMAC on May 27. Upon receipt of the ad hoc committee report, Defendants had an objectively reasonable basis to take another peer review action. The IMAC decided that same day that a further restriction of Poliner's privileges was necessary. For immunity purposes it is of no moment that they requested Poliner's consent to the extension of the abeyance on May 29, the purported fifteenth day, because the decision to further restrict his privileges was made within the required 14 days.

We conclude that the extension of the abeyance falls within § 11112(c)(2)'s curtilage,[46] and in any event, Defendants imposed the restriction after procedures that were fair to Poliner under the circumstances. The "emergency" provision requires only that a failure to act "may result in an imminent danger to the health of any individual." That the ad hoc committee concluded that Poliner gave substandard care in half of the cases reviewed, and considering the seriousness of the diagnostic error with Patient 36 and the serious risks that attend cardiac catheterizations, Defendants were fully warranted in concluding that failing to impose further temporary restrictions "may result" in an imminent danger. Poliner contends that this provision applies in "extraordinary cases in which a physician suddenly becomes impaired or grossly incompetent." Poliner cites no authority for this proposition, and the plain language of the statute is not so limited. Moreover, authority from our sister circuits and the

---

[46] The parties dispute whether § 11112(c)(2) relieves compliance with all of § 11112(a)'s standards or is limited to § 11112(a)(3)'s "notice and hearing" requirement. We need not, and do not, wade into this dispute because we conclude that the extension of the abeyance satisfies the requirements of § 11112(a)(1), (2), and (4).

district courts conclude that the provision is not so narrow,[47] as does an unpublished decision from our court.[48]

Poliner received the "subsequent notice and hearing or other adequate procedures" that the provision contemplates. To the point, the district court ruled at summary judgment that, as to the June 12 suspension, Poliner received notice and hearing adequate to satisfy the HCQIA. That ruling, which has not been challenged, establishes that Poliner received adequate process for purposes of the "emergency" provision.

Our review confirms this, and further leads us to conclude that the extension was imposed "after such other procedures as are fair to the physician

---

[47] See Sugarbaker, 190 F.3d at 917 (indicating that the Executive Committee's decision to impose a "precautionary suspension" would fall under the emergency provision after a clinical review committee reviewed 24 of the doctor's patients and reported multiple areas of concern); Brader, 167 F.3d at 836-37, 842 (holding that a summary suspension of a surgeon's privileges to perform an operation fell under the emergency provision where a review of the mortality rates for the procedure at the hospital showed that the surgeon was responsible for half of the mortalities, and an outside reviewer reported numerous complications and instances of "poor surgical judgment"); Johnson v. Christus Spohn, No. C-06-138, 2008 WL 375417, at *12 (S.D. Tex. Feb. 8, 2008) ("Based on the purportedly negligent treatment of RM [who eventually died], the Court has little trouble finding Dr. Johnson's summary suspension was appropriately based on the reasonable belief he failed to care for a patient and thus may have represented an imminent danger to the health of an individual."); Schindler v. Marshfield Clinic, No. 05-C-705-C, 2006 WL 2944703, at *13 (W.D. Wisc. Oct. 12, 2006) (explaining that, where a surgeon "was performing surgery, a surgical instrument slipped and plaintiff's patient was rendered quadriplegic for an unspecified period of time," and the surgeon was temporarily suspended during an investigation, the emergency provision was "satisfied"); Bakare, 469 F. Supp. 2d at 282, 289 & n.31 (holding that the emergency provision applied to a precautionary suspension that was imposed after an outside reviewer reviewed ten of the plaintiff's cases and concluded that "beyond a reasonable degree of medical certainty [Dr. Bakare's] medical management falls below the established standards"); Pfenninger v. Exempla, Inc., 116 F. Supp. 2d 1184, 1202 (D. Colo. 2000) (concluding that the emergency provision was applicable where "the Executive Committee found that Dr. Pfenninger had exercised poor judgment in three recent cases; that he had a history of similar problems, and that summary suspension was 'necessary to protect patients'").

[48] See Payne v. Harris Methodist HEB, No. 01-10212, 2002 WL 1396969, at *1 n.1 (5th Cir. June 7, 2002) (holding, in considering the emergency provision, that "[g]iven the serious allegations of incompetence made against Payne, we agree with the district court that the hospital was permitted to suspend him temporarily while sorting out the truth of the allegations").

under the circumstances." The May 14 letter provided notice to Poliner of the peer review, which patient triggered it, the other patients then-of concern, that an ad hoc committee review would be taken and a general description of how that review would be conducted, and finally that Poliner would have "an opportunity to meet with the [IMAC] and me in person to respond to or clarify any clinical concerns that could result in a recommendation for corrective action prior to that action being taken." Poliner and his lawyer knew what was happening and why before the extension.

The ad hoc committee's conclusions justify Defendants' decision to impose another period of the same restrictions without immediately giving a hearing. The committee review raised serious problems with Poliner's cases, and rather than acting precipitously, Defendants sought out further information. It is difficult to conceive of a meaningfully different response from Defendants. Upon receipt of the ad hoc committee's review, it would have been untenable to restore full privileges while a hearing was scheduled and Poliner was given time to prepare. Had Defendants immediately held a hearing, there would have been no opportunity for Poliner to review the cases at issue, and we have no doubt that we would be considering whether such a hearing was "fair." Further informing our analysis is the fact that Poliner had engaged counsel prior to the extension of the abeyance. It bears emphasizing that the restriction on privileges was temporary in nature and limited in scope, tailored to the objective facts before the hospital officials. Poliner received "fair" procedures under these circumstances.

Once the decision was made, Poliner was quickly notified that the extension was needed, given further details of the ad hoc committee review, and told again that he would have an opportunity to address the IMAC. Ten days after extending the restrictions, a date for a hearing was set and Poliner was notified of the hearing, told which patients had been reviewed and the concerns

in those cases, and given access to the patient records. The hearing, in which Poliner personally participated, was promptly held on June 11.

This case demonstrates how the process provisions of the HCQIA work in tandem: legitimate concerns lead to temporary restrictions and an investigation; an investigation reveals that a doctor may in fact be a danger; and in response, the hospital continues to limit the physician's privileges. The hearing process is allowed to play out unencumbered by the fears and urgency that would necessarily obtain if the physician were midstream returned to full privileges during the few days necessary for a fully informed and considered decision resting on all the facts and a process in which the physician has had an opportunity to confront the facts and give his explanations. The interplay of these provisions may work hardships on individual physicians, but the provisions reflect Congress' balancing of the significant interests of the physician and "the public health ramifications of allowing incompetent physicians to practice while the slow wheels of justice grind."[49] Defendants satisfied the notice and hearing requirements, and no reasonable jury could conclude otherwise.

## E.

Finally, we consider whether each peer review action was taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts." "Our analysis under § 11112(a)(4) closely tracks our analysis under § 11112(a)(1)."[50] In both instances, the temporary restrictions were "tailored to address the health care concerns" that had been raised[51]—procedures in the cath lab—leaving untouched Poliner's other privileges. Nor was the information relayed to Knochel "so obviously mistaken

---

[49] Rogers v. Columbia/HCA of Cent. La., Inc., 971 F. Supp. 229, 236 (W.D. La. 1997).

[50] Brader, 167 F.3d at 843; see also Meyers, 341 F.3d at 471 (same); Singh, 308 F.3d at 38 n.13 (same); Sugarbaker, 190 F.3d at 916 (same).

[51] Mathews, 87 F.3d at 638.

or inadequate as to make reliance on [it] unreasonable."[52]   There was an objectively reasonable basis for concluding that temporarily restricting Poliner's privileges during the course of the investigation was warranted by the facts then known, and for essentially the reasons given above, we hold that Defendants satisfy this prong.

To allow an attack years later upon the ultimate "truth" of judgments made by peer reviewers supported by objective evidence would drain all meaning from the statute.   The congressional grant of immunity accepts that few physicians would be willing to serve on peer review committees under such a threat; as our sister circuit explains, "'the intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise.'"[53] At the least, it is not our role to re-weigh this judgment and balancing of interests by Congress.

## IV.  Conclusion

Not only has Poliner failed to rebut the statutory presumption that the peer review actions were taken in compliance with the statutory standards, the evidence independently demonstrates that the peer review actions met the statutory requirements. Because Defendants are immune under the HCQIA, we have no occasion to consider Defendants' other substantial arguments that we must reverse and render judgment based on state law immunity[54] and because Poliner failed to prove the substantive elements of his claims.  One of the largest difficulties lies in causation, that is, whether Poliner proved that any of the purported damages were caused by the abeyance and abeyance extension as

---

[52] Id.

[53] Lee, 408 F.3d at 1073 (quoting Bryan, 33 F.3d at 1337).

[54] See Tex. Occ. Code Ann. § 160.010.

opposed to the June 12 suspension that was immunized before trial. Nor need we reach the compelling arguments that, at the very least, we would have to reverse and remand for a new trial because of the jury's excessive verdict[55] and manifest trial errors.

We REVERSE the judgment of the district court and RENDER judgment for Defendants.

---

[55] See Wells v. Dallas Indep. Sch. Dist., 793 F.2d 679, 683-84 (5th Cir. 1986) (explaining that "when an award is 'so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive,' remittitur is inadequate and the only proper remedy is a new trial" (quoting Caldarera v. E. Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983))).