IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2009 Session

## MARCEL ELUHU, M.D. v. HCA HEALTH SERVICES OF TENNESSEE, INC., D/B/A CENTENNIAL MEDICAL CENTER

Appeal from the Chancery Court for Davidson County
No. 05-1012-I    Claudia Bonnyman, Chancellor

No. M2008-01152-COA-R3-CV - Filed October 27, 2009

Cardiologist whose hospital privileges were revoked brought suit against the hospital asserting multiple causes of action, including breach of contract. Finding the hospital entitled to immunity under the Health Care Quality Improvement Act and the Tennessee Peer Review Law, the chancellor granted the hospital's motion for summary judgment on all claims for monetary damages. The court subsequently granted the hospital's motion for summary judgment on all remaining claims for injunctive and declaratory relief. We have concluded that the court erred in granting summary judgment on the claims for injunctive relief other than the breach of contract claims. Otherwise, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed In Part, Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

C. Bennett Harrison, Jr., Brian Holmes, and Jay N. Chamness, Nashville, Tennessee, for the appellant, Marcel Eluhu, M.D.

Dixie W. Cooper, Lisa D. York, Clarence James Gideon, and Catherine Corless, Nashville, Tennessee, for the appellee, HCA Health Services of Tennessee, Inc., d/b/a Centennial Medical Center.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Dr. Marcel Eluhu is a cardiologist who was first granted provisional privileges at Centennial Medical Center ("CMC") in 1989 and soon became a member of the attending medical staff. Dr. Eluhu thereafter received additional training in interventional cardiology and, after obtaining board

certification, was granted unrestricted privileges to practice cardiovascular medicine at CMC in 1998. Dr. Eluhu also had privileges at a number of other hospitals in the Nashville area.

In January 1999, another cardiologist at CMC submitted a complaint against Dr. Eluhu to CMC's Medical Executive Committee ("MEC"). Dr. Eluhu disputed the accusations in the complaint and pursued the matter through the fair hearing procedure established by the hospital's bylaws. The fair hearing panel adopted the MEC's recommendation that Dr. Eluhu be required to complete fifty proctored cases in order to maintain his privileges. CMC's board of trustees agreed. Dr. Eluhu successfully completed the proctoring process, and his privileges were fully reinstated in May 2001.

The events at issue in the present case occurred in October 2003. While there are factual disputes between the parties concerning these events, we will attempt to summarize the basic, undisputed facts concerning the two cases out of which the complaints against Dr. Eluhu arose.[1] Ms. B came into the CMC emergency room early on Saturday morning, October 25, 2003. The patient went into cardiogenic shock. Dr. Eluhu, the cardiologist on call, performed an emergency procedure in the cardiac catheterization lab to open Ms. B's arteries. Shortly after the procedure, Ms. B developed a hematoma, and Dr. Eluhu instructed the nurses about treating this bleeding. After Dr. Eluhu left the hospital, the bleeding worsened, and the nurses were unable to stop it. One of the nurses called Dr. Eluhu, who ordered a vascular consultation. Dr. John Keyser, a vascular surgeon, was called. Dr. Keyser and Dr. Eluhu arrived at the hospital at about the same time. Dr. Keyser successfully repaired a leak in Ms. B's femoral artery. Based upon information he received from a nurse, it was Dr. Keyser's understanding that Dr. Eluhu had initially refused to return to the hospital when called.

The same day, October 25, 2003, Ms. F presented to the CMC emergency room with chest pain. She was admitted under Dr. Eluhu's care, and he first saw her early Sunday morning, October 26, 2003. That afternoon, Ms. F went into cardiac arrest, and Dr. Eluhu performed an emergency procedure using an aortic balloon pump. The nurses assisting with the procedure had trouble getting the balloon pump to work properly. Ms. F developed a cardiac complication, and Dr. Keyser was again called in for consultation. Dr. Keyser asked Dr. Eluhu to go talk with Ms. F's family. After reviewing the case, Dr. Keyser determined that surgery was not a viable option in light of Ms. F's overall condition. Dr. Keyser became frustrated because Ms. F's family had been left with the impression, presumably from Dr. Eluhu, that Ms. F would not survive without surgery. Ms. F's condition stabilized without surgery, but she died a few weeks later from serious cardiac problems. Dr. Keyser informed Dr. Eluhu that he would no longer consult on Dr. Eluhu's cases.

On Monday, October 27, 2003, Dr. Keyser spoke with Dr. Robert Alford, CMC's medical director, to discuss his concerns about Dr. Eluhu's two cases on which he had consulted over the weekend. Dr. Keyser described the events to Dr. Alford, noting that both cases involved serious

---

[1]As will be discussed more fully below, we resolve any factual disputes in favor of the plaintiff in our consideration of the defendant's motions for summary judgment.

vascular complications, and informed him that he did not want to consult on any of Dr. Eluhu's cases in the future. One of Dr. Keyser's main concerns was the difficulty he experienced in communicating with Dr. Eluhu.[2] He did not ask that any corrective action be taken.

On October 30, 2003, Dr. Alford then discussed the cases with Dr. Louis Johnson, chairman of CMC's MEC. Dr. Johnson sent a letter to Dr. Jeffrey Webber, chair of CMC's Department of Cardiovascular Medicine, "formally requesting on behalf of the MEC that you form an ad hoc committee to investigate the circumstances regarding care provided two patients on October 25, 2003, by Marcel Y. Eluhu, M.D." Dr. Johnson summarized the two patient care issues raised by Dr. Keyser as follows:

- Lack of Dr. Eluhu's availability and direction for staff caring for patients having complications of procedures performed by Dr. Eluhu

- Failure of Dr. Eluhu to provide appropriate physician-to-physician communication in requesting consultation to assist in managing major complications

Dr. Webber and Dr. Johnson together decided that while the investigation was going on, Dr. Eluhu's emergency room privileges would be summarily suspended. They sent a letter dated October 31, 2003, to Dr. Eluhu informing him that his ER call was summarily suspended "[b]ecause of concerns regarding complications arising in two of your patients who underwent emergency cardiac catheterizations on October 25/26, 2003." The suspension was to last "until an investigation of the events surrounding these complications can be brought to a satisfactory conclusion." The letter provided that the summary suspension was being undertaken due to "actions detrimental to patient safety or to the delivery of quality or efficient patient care" pursuant to Article X, Section 10.1.B of the CMC bylaws. The letter informed Dr. Eluhu of his right to request a hearing and gave a brief summary of the fair hearing procedures under the bylaws, which were enclosed with the letter.

Dr. Webber organized an ad hoc committee ("AHC"), which proceeded to investigate the two cases referred to it by the MEC. The AHC consisted of five doctors, including one cardiologist, and was chaired by Dr. Paul Seitz, an anesthesiologist. The committee met once in November and on December 4, 2007, reviewed the available medical records and interviewed Dr. Keyser and Dr. Eluhu. In its report to the MEC, the AHC summarized the statements of Dr. Keyser and Dr. Eluhu and stated the following conclusions:

1. There was no evidence Dr. Eluhu abandoned his patients. Poor communication and miscommunication between Drs. Keyser and Eluhu was evident.

---

[2] Dr. Eluhu is from the Democratic Republic of Congo. Dr. Keyser's frustrations in communicating with Dr. Eluhu seem to have stemmed in part from a language barrier.

2. The committee identified serious quality of care concerns with Dr. Eluhu's management of both patients. There were specific technical performance issues related to the cardiac catheterizations and the development of bleeding complications. A delayed initial ICU assessment of an unstable acute coronary patient, the absence of timed documentation, the assessment or acknowledgement of life-threatening bradycardic episodes (the patient subsequently suffered a bradycardiac arrest), altered medical records to conceal information, and failure to re-assess an anticoagulated post-cardiac cath patient with a post-procedure hematoma complication before leaving the hospital were examples of quality of care concerns.

3. Though not a focus of this committee we were also concerned with poor ICU nursing service documentation during Ms. F's initial ICU course. There were few nursing notations, delayed reporting (over 8 hours), no documentation of MD notification of serious bradycardic episodes, and no physician order for the atropine treatment rendered, for example.

While deferring to the MEC regarding the appropriateness of corrective action, the AHC stated that "further evaluation of the serious quality of care issues raised by Dr. Eluhu's management of these patients is warranted."

The MEC met on December 5, 2003. In its report, the MEC adopted the AHC's report and summarily suspended all of Dr. Eluhu's privileges. The MEC recommended to the hospital's board of trustees that Dr. Eluhu's medical staff membership be revoked. In a letter dated December 10, 2003, Dr. Johnson informed Dr. Eluhu of the MEC's decision and of his right to a hearing. The letter includes the following statements:

The MEC unanimously concurred with the finding [of the AHC] indicating inadequate performance and judgment resulting in patient harm in the two cases at issue. The MEC further took into account earlier instances of questionable patient care on your part.

According to the letter, the MEC decided to summarily suspend Dr. Eluhu's privileges and to recommend revocation of medical staff membership "because failure to do so might result in imminent danger to the health of such patients at Centennial." Dr. Eluhu requested a hearing, and his attorney contacted CMC's attorneys for more information concerning the issues to be presented at the hearing.

On January 12, 2004, Dr. Webber wrote Dr. Eluhu a letter informing him that two of his cases "failed departmental quality screens" and received the highest severity rating. Dr. Eluhu was given 30 days to provide additional information regarding these cases and the severity ratings. Dr. Eluhu's attorney sent a letter dated January 29, 2004, to CMC's attorneys asking for more specific information regarding the peer review conclusions "so that Dr. Eluhu may properly respond."

4

On February 12, 2004, the CMC attorneys sent Dr. Eluhu's attorney a letter detailing the conclusions of the peer reviewer concerning Ms. B's case and Ms. F's case. On the same day, the CMC attorneys also sent Dr. Eluhu's attorney a ten-page letter responding to Dr. Eluhu's requests for documentation and for a summary of the issues to be addressed at the hearing. Included with the letter was data concerning Dr. Eluhu's complication rates from 2000 to 2003 with comparative data for the cardiovascular department. The issues to be addressed at the hearing were grouped into three categories: (1) Dr. Eluhu's care and treatment of Ms. B, (2) his care and treatment of Ms. F, and (3) his "lack of judgment, competence, skill, and technique." With respect to both Ms. B and Ms. F, the letter summarized the relevant sequence of events, identified quality of care issues with respect to Dr. Eluhu's actions, and discussed the hospital's position as to the applicable bylaws. As to the third category of issues, the letter set forth CMC's position as to the relevant bylaws and its intent to prove that "Dr. Eluhu's judgment, technique, skill, and competence are not sufficient to qualify for Medical Staff membership at Centennial Medical Center." In its letter, CMC specifically referenced the comparative data and the hospital's previous requirement that Dr. Eluhu complete a preceptorship.

Prior to the hearing, the parties exchanged witness and exhibit lists.

### Fair Hearing

The fair hearing took place on February 24 and 25, 2004. The fair hearing committee ("FHC") consisted of four physicians.[3] The MEC presented the following witnesses: Dr. Alford, Dr. Webber, Dr. Keyser, Dr. John Bright Cage (a cardiologist), Lynne Blair-Anton (a nurse who worked in the catheterization lab during the October 2003 incidents), and Marian Mosby (a nurse and CMC's quality coordinator, who testified about the hospital's collection of data and compilation of comparative data). Dr. Eluhu presented the following witnesses: Dr. Eluhu, Dr. James Potts (a cardiologist at Meharry Medical College), Dr. Robert Piana (a cardiologist at Vanderbilt University Medical Center), Dr. Carlton Adams (a member of the AHC), and Theodore Addai (chief of cardiology at Meharry Medical Center and Nashville General Hospital).

The FHC concluded that the preponderance of the evidence did not indicate that the MEC's recommendations lacked any substantial basis or were arbitrary, unreasonable, or capricious. The FHC also went further:

> [T]he evidence presented to the [FHC] was more extensive than that presented to the MEC when it made its recommendation. Further, the investigation into the facts performed by the attorneys for the parties was more extensive than the investigation performed by the Ad Hoc Committee which reported to the MEC. Based on its access to information of greater depth and quantity than the MEC had, the [FHC] has chosen to offer recommendations for disciplinary action against Dr. Eluhu independent of the actions taken by the MEC.

---

[3] The FHC originally had a fifth member, but that physician was excused because of his previous participation in the matter as a member of the MEC. The parties agreed to proceed with only four panel members.

The FHC offered alternative recommendations: (1) complete revocation of Dr. Eluhu's privileges at CMC, or (2) a lesser degree of sanction involving, at a minimum, permanent revocation of Dr. Eluhu's privileges in invasive cardiology; mandatory assessment by the Tennessee Medical Foundation to rule out organic causes for his behavior; a two-year probation period during which he would agree to forfeit his right to a fair hearing in the event of further corrective action; and a focused review by the CMC quality assurance department of his activity during the probationary period.

In its report, the FHC also explained that discrepancies in the evidence, Dr. Eluhu's introduction of inaccurate information into the medical record, and the similarity of the issues presented to those involved in the previous fair hearing panel "led the Panel to doubt the candor of Dr. Eluhu's testimony before the panel." The FHC report includes the following findings:

1. Ms. B. The panel determined that Dr. Eluhu's decision to gain arterial access through the right femoral artery in the setting of this patient's clinical history, his handling of the patient's post procedure care, and his initial response upon being notified of this patient's post procedure clinical circumstances were below the standard of care of Centennial Medical Center.

2. Ms. F. The panel determined that Dr. Eluhu either failed to recognize, or failed to appropriately respond to a significant vascular injury in the early phase of his catheterization procedure. In addition, the panel determined that the length of time between Ms. F's admission to the CCU and the documented evidence of his first on premises contact with her and the care he provided during this extended period of time were suboptimal. The panel determined these events to be below the standard of care of Centennial Medical Center.

3. The panel determined that Dr. Eluhu intentionally entered inaccurate written and inaccurate dictated information into the medical record with respect to the vascular injury sustained by Ms. F.

4. The panel recognized that the events concerning the above patients cannot be viewed as isolated events out of the context of Dr. Eluhu's broader practice. Dr. Eluhu's physician profile, in addition to the specific cases leading to his prior reduction of privileges, contains numerous instances of complications and either marginal or suboptimal patient care spanning many years. His current QA data suggest a higher complication rate than is present within the department as a whole. Several of the suboptimal care issues identified by this panel are similar to the issues addressed at his prior fair hearing. This is viewed by the panel as a failure on the part of Dr. Eluhu to improve his patient care practices despite the previous in good faith efforts undertaken by Centennial Medical Center to focus his attention on his deficiencies in this regard.

6

5. Given the numerous contradictions between Dr. Eluhu's testimony and both the testimony of others and the medical record, the panel determined that Dr. Eluhu was not candid, and likely intentionally misleading, in his testimony before the Panel.

6. The Panel determined, based upon Dr. Eluhu's testimony, that he had little or no insight into the fundamental deficiencies in his patient management practice patterns that lead to adverse clinical events such as those that occurred with Ms. B and Ms. F.

Dr. Eluhu requested an appeal of the MEC's decision, which was reviewed by an appellate review committee ("ARC"). In a report issued on August 2, 2004, the ARC "affirm[ed] the MEC's recommendation that Dr. Eluhu's privileges be terminated." On August 5, 2004, the CMC board of trustees approved the ARC's recommendation to accept the MEC's recommendation that Dr. Eluhu's medical staff privileges be terminated. On August 17, 2004, CMC reported the revocation of Dr. Eluhu's privileges to the National Practitioner Data Bank.

Lawsuit

Dr. Eluhu filed this action against HCA Health Services of Tennessee, Inc., d/b/a CMC, on April 21, 2005. He alleged causes of action for breach of contract/CMC's bylaws, breach of implied duty of good faith and fair dealing, defamation, common law disparagement, statutory disparagement under the Tennessee Consumer Protection Act, and intentional interference with existing and prospective business relationships. The complaint sought monetary damages as well as declaratory and injunctive relief. The court denied CMC's motion to dismiss the claims for defamation and common law and statutory disparagement but ordered Dr. Eluhu to clarify the allegations related to those claims. Dr. Eluhu therefore filed an amended complaint on September 19, 2005. CMC then filed an answer and a counterclaim asserting that Dr. Eluhu breached his contract with CMC by filing the lawsuit.

On November 13, 2006, after discovery, Dr. Eluhu filed an application for a temporary injunction requesting that the court compel CMC to reinstate his privileges at CMC and revise or retract its report to the national data bank. After a hearing in December 2006, the court denied Dr. Eluhu's request for a temporary injunction. The court later entered an order adopting findings of fact and conclusions of law regarding its denial of the temporary injunction. After reviewing the evidence and the bylaws, the court concluded that "the Fair hearing, the process leading up to the Fair hearing and the subsequent appellate review were not arbitrary, capricious or unreasonable." The court did not find that CMC had breached its bylaws. The court determined that it was unlikely that Dr. Eluhu's claims would succeed on the merits. While finding that there was irreparable harm to Dr. Eluhu's reputation and ability to earn money, the court balanced this harm against harm to the hospital and the public interest and concluded that the public interest would not be served by the issuance of an injunction to reinstate Dr. Eluhu's privileges.

7

CMC filed a motion for summary judgment asserting its immunity from actions for monetary damages pursuant to the Health Care Quality Improvement Act and the Tennessee Peer Review Law. The court granted the motion for summary judgment with respect to all claims for damages. The court stated that "any material factual disputes in this case are about medical judgment" and that "medical judgment differences do not remove the immunity provided by the legislature."

On May 7, 2007, CMC filed a motion for summary judgment on the remaining claims for injunctive and declaratory relief. The court granted the motion. On May 1, 2008, the court entered an agreed order voluntarily dismissing CMC's counterclaim against Dr. Eluhu.

ISSUES ON APPEAL

Dr. Eluhu asserts that the trial court erred (1) in granting summary judgment as to money damages, (2) in granting summary judgment on the claims for injunctive and declaratory relief, and (3) in denying his application for a temporary injunction.

STANDARD OF REVIEW

We begin by setting out the standard of review generally applicable to a grant of summary judgment. However, with respect to the claims for monetary damages in this case, that standard of review will be modified, as discussed below, because of the provisions of the Health Care Quality Improvement Act and the Tennessee Peer Review Law.

In reviewing a summary judgment, this court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisified. *Hunter v. Brown*, 955 S.W.2d 49, 50 (Tenn. 1997). The party seeking summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). We must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.*; *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993). If there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd*, 847 S.W.2d at 211; *EVCO Corp. v. Ross*, 528 S.W.2d 20, 25 (Tenn. 1975). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, a moving party must negate an element of the opposing party's claim or "show that the monmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008).

The Health Care Quality Improvement Act ("HCQIA") and the Tennessee Peer Review Law ("TPRL") establish a presumption that the participants in peer review actions are entitled to immunity from monetary damages. 42 U.S.C. § 11112(a); Tenn. Code Ann. § 63-6-219(d)(3); *Peyton v. Johnson City Med. Ctr.*, 101 S.W.3d 76, 78 (Tenn. Ct. App. 2002). The plaintiff can rebut this presumption by a preponderance of the evidence. 42 U.S.C. § 11112(a); *Peyton*, 101 S.W.3d at 78. The effect of this presumption of immunity is to shift the burden of production to the plaintiff

8

to show that the hospital failed to meet the standards for HCQIA or TPRL immunity. *See Curtsinger v. HCA, Inc.*, No. M2006-00590-COA-R3-CV, 2007 WL 1241294, at \*5 (Tenn. Ct. App. Apr. 27, 2007); *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 32-33 (1ˢᵗ Cir. 2002). As a result of this presumption, the standard of review applicable to a grant of summary judgment under the HCQIA and TPRL is unusual: "[A]lthough the defendant is the moving party, we must examine the record to determine whether the plaintiff 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA.'"[4] *Curtsinger*, 2007 WL 1241294, at \*5 (quoting *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3ʳᵈ Cir. 1999) (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1334 (11ᵗʰ Cir. 1994))). Despite this shifting of the burden of production, this court must still view the facts in the light most favorable to the plaintiff, the nonmoving party. *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, No. 1:07-CV-258, 2008 WL 4191275, at \*4 (E.D. Tenn. Sept. 8, 2008) (citing *Singh*, 308 F.3d at 32).

A trial court's issuance or nonissuance of injunctive relief is reviewed under an abuse of discretion standard. *Bd. of Comm'rs v. Parker*, 88 S.W.3d 916, 919 (Tenn. Ct. App. 2002). An abuse of discretion occurs when a trial court reaches a decision contrary to logic that causes harm to the complaining party or applies an incorrect legal standard. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). The trial court's decision will be upheld "so long as reasonable minds can disagree as to the propriety of the [trial court's] decision." *Id.* (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).

## MONETARY DAMAGES

CMC's first motion for summary judgment was based upon the hospital's immunity from liability under the Health Care Quality Improvement Act and the Tennessee Peer Review Law. This court recently noted that the requirements of the Tennessee Peer Review Law are "essentially identical" to the requirements of the Health Care Quality Improvement Act. *Curtsinger*, 2007 WL 1241294, at \*5 n.1 (quoting *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 353-54 (6ᵗʰ Cir. 1999)). On appeal, Dr. Eluhu confines his immunity analysis to the standards of the Health Care Quality Improvement Act.

Congress enacted the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101 through 11152, in 1986 "to encourage self-policing by healthcare professionals in response to what it determined to be a crisis." *Curtsinger*, 2007 WL 1241294, at \*13. Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42. U.S.C. § 11101(1). The threat of litigation often deterred effective

---

[4]In *Hannan v. Alltel Publishing Co.*, our Supreme Court enunciated a new standard for determining when a party moving for summary judgment has shifted the burden of production to the nonmoving party. *Hannan*, 270 S.W.3d at 9-10. Because we are dealing with HCQIA/TPRL immunity, however, the burden of production automatically shifts to the plaintiff.

hospital peer review.  42 U.S.C. § 11101(4); *Bryan*, 33 F.3d at 1321.  As this court has previously recognized, "[i]n order to encourage the type of peer review that would expose incompetent physicians, the HCQIA shields health care entities and individual physicians from liability for damages for actions performed in the course of monitoring the competence of health care personnel." *Curtsinger*, 2007 WL 1241294, at \*13.

Under the HCQIA, if a "professional review action" meets certain requirements, those participating in the review process are entitled to immunity from monetary damages under any state or federal law.  42 U.S.C. § 11111(a)(1).  A "professional review action" is defined as follows:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).  "Professional review activity" is defined as:

> [A]n activity of a health care entity with respect to an individual physician–
>
> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
>
> (B) to determine the scope or conditions of such privileges or membership, or
>
> (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).  There is no dispute in this case that CMC qualifies as a professional review body.[5]  There is, however, a difference in interpretation as to how many professional review actions are at issue.

Dr. Eluhu asserts that there are four separate professional review actions that must each meet all of the HCQIA requirements in order for immunity to apply: (1) the summary suspension of his ER privileges; (2) the AHC's recommendations; (3) the MEC's decision to suspend all of Dr. Eluhu's privileges and recommend permanent revocation; and (4) the FHC's recommendation to uphold the MEC's recommendation.  In arguing in favor of four professional review actions, Dr. Eluhu focuses on the precise language of the statutory definition, which refers to "an action or

---

[5] There is no dispute that CMC qualifies as a "professional review body" as defined at 42 U.S.C. § 11151(11): "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity."

recommendation . . . which affects (or may affect) adversely the clinical privileges." 42 U.S.C. § 11151(9). Taken literally, the statutory reference to "recommendation" seems to encompass each separate step of the peer review process at which any type of recommendation is made. However, as noted by the court in *Mathews v. Lancaster General Hospital*, "there must be some distinction between 'professional review activity' and 'professional review action' or Congress would not have used two separate terms to refer to deeds done in connection with the peer review process." *Mathews*, 883 F. Supp. 1016, 1028 (E.D. Pa. 1995). The *Mathews* court addressed the meaning of "professional review action" and "professional review activity" in detail and, reading all of the statutory provisions together, came to the following conclusion: "[T]he term 'professional review activity' refers to preliminary investigative measures taken in 'a reasonable effort to obtain the facts' relevant to a possible change in a physician's privileges, while the term 'professional review action' refers to the decision that results from a review of the facts obtained." *Id.* at 1027; *see also Meyers v. Logan Mem'l Hosp.*, 82 F. Supp. 2d 707, 713-14 (W.D. Ky. 2000) (classifying the hospital board's vote as "professional review action" and concluding that "[a]ll other actions constitute 'professional review activity' and as such are not subject to separate scrutiny under § 11112(a)"). The *Mathews* court found that the type of interpretation urged in this case by Dr. Eluhu "is unworkable when viewed in conjunction with other statutory provisions." *Mathews,* 883 F. Supp. at 1028. We agree.

Applying the above analysis, we conclude that there are three professional review actions at issue in this case: the summary suspension of Dr. Eluhu's ER privileges, the summary suspension of all of Dr. Eluhu's privileges at CMC, and the permanent revocation of his privileges at CMC. *See Stratienko*, 2008 WL 4191275, at *2-3 (classifying a summary suspension as a professional review action). The AHC was an investigative committee of the MEC and reported to the MEC. Dr. Eluhu focuses on the "recommendations" of the AHC as warranting separate scrutiny. In fact, the AHC made no formal recommendations but identified additional quality of care concerns, an appropriate part of the investigative process. Moreover, even if the AHC made recommendations, its activities would not constitute professional review actions. The final decision concerning permanent revocation of Dr. Eluhu's privileges was made by the board of trustees after the FHC conducted a hearing regarding the MEC's recommendations.

For immunity to apply, the HCQIA requires that the professional review action be taken as follows:

> (1) in the reasonable belief that the action was in furtherance of quality health care,

> (2) after a reasonable effort to obtain the facts of the matter,

> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

11

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C.A. § 11112(a). The reasonableness required under § 11112(a) is evaluated under an objective standard. *Curtsinger*, 2007 WL 1241294, at *6. The good faith or bad faith of the reviewers is irrelevant. *Peyton*, 101 S.W.3d at 84. The HCQIA creates a presumption that these standards have been met unless the presumption is rebutted by a preponderance of the evidence. 42 U.S.C. § 11112(a).

Thus, "a plaintiff has the burden of demonstrating, by preponderance of the evidence, that the requirements of § 11112(a) have not been met in his peer review." *Stratienko*, 2008 WL 4191275, at *3. Since this case was decided at the summary judgment stage, we must determine whether "a reasonable jury, viewing the facts in the best light for [the plaintiff], [might] conclude that [the plaintiff] has shown, by a preponderance of the evidence, that the [defendant's] actions are outside the scope of § 11112(a)." *Singh*, 308 F.3d at 32.

A. Reasonable belief action was in furtherance of quality health care.

Were the two summary suspensions and the permanent revocation of Dr. Eluhu's privileges taken based upon a reasonable belief that these actions were in furtherance of quality health care? We must consider whether "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan*, 33 F.3d at 1323.

Dr. Eluhu does not argue that the initial summary suspension of his ER privileges was not made in a reasonable belief that this action was in furtherance of quality health care. We therefore proceed to consider the summary suspension of all of Dr. Eluhu's hospital privileges by the MEC. This action was taken pursuant to § 10.3A. of the hospital's bylaws, a section that authorizes the MEC to summarily suspend a practitioner's privileges "whenever failure to take such an action may result in an imminent danger to the health of any individual." The HCQIA contains special provisions with respect to summary suspensions. *See* 42 U.S.C. § 11112(c). In the present case, the pertinent statutory exception provides as follows:

For purposes of section 11111(a) of this title, nothing in this section shall be construed as–
. . . .
(2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.

42 U.S.C. § 11112(c). While this exception applies most directly to the notice requirements of § 11111(a)(3), the statutory language "implicitly recognizes that a professional review body can

reasonably believe that this type of action [a summary suspension] furthers quality health care." *Straznicky v. Desert Springs Hosp.*, No. 2:09-cv-00731-LDG (RJJ), 2009 WL 1905298, at *8 (D. Nev. July 1, 2009).

Dr. Eluhu argues that there is a genuine issue of material fact as to whether the MEC reasonably believed that its actions were in furtherance of quality health care. He points out that the AHC report, which formed the basis for the MEC's actions, found "no evidence Dr. Eluhu abandoned his patients." The AHC report did, however, identify quality of care concerns warranting further evaluation. Dr. Eluhu faults the MEC's alleged failure to further evaluate these quality of care issues, but has presented no evidence to rebut the presumption that the MEC based its decision on a reasonable belief that summary suspension would further quality health care. Dr. Eluhu further faults the MEC for failing to call witnesses; this argument ignores the fact that the AHC, the investigative committee that reported to the MEC, interviewed Dr. Eluhu and Dr. Keyser and summarized their positions in its report to the MEC. The AHC also reviewed the medical records of Ms. B and Ms. F. We find no basis upon which a reasonable jury could conclude that Dr. Eluhu overcame the presumption that CMC met this statutory requirement.

Similarly, as to the MEC's recommendation that Dr. Eluhu's privileges be permanently revoked, Dr. Eluhu has failed to produce evidence to overcome the statutory presumption that CMC acted with a reasonable belief that its actions would further quality health care. The FHC conducted a fair hearing over two days and heard from multiple fact and expert witnesses. While objecting to some of the procedures, discussed more fully below, Dr. Eluhu has failed to present evidence from which a reasonable jury could conclude that CMC did not act in a reasonable belief that its decision to permanently revoke Dr. Eluhu's privileges would further quality health care.

B. Reasonable effort to obtain the facts of the matter.

On October 31, 2003, Dr. Johnson, the chair of the MEC, and Dr. Webber, chair of the cardiovascular department, considered Dr. Keyser's complaints, as presented by Dr. Alford, CMC's medical director. Dr. Webber reviewed both patients' medical charts. Conferring together, these two physicians made the decision to summarily suspend Dr. Eluhu's ER privileges. Section 10.3A. of the hospital's bylaws, cited above, also authorizes any two of a list of hospital officials to summarily suspend a practitioner's privileges "whenever failure to take such an action may result in an imminent danger to the health of any individual."

Dr. Eluhu argues that Dr. Webber and Dr. Johnson should have at least interviewed Dr. Keyser and Dr. Eluhu over the telephone before making such a decision. However, as noted above, 42 U.S.C.A. § 11112(c) contemplates the possibility that summary suspension prior to notice and "other adequate procedures" may be warranted "where the failure to take such action may result in

13

an imminent danger to the health of any individual." Dr. Eluhu has presented no evidence to rebut the presumption that CMC's efforts to obtain the facts prior to summary suspension were reasonable.[6]

Dr. Eluhu cites the case of *Stratienko v. Chattanooga-Hamilton County Hospital Authority*, a case in which the court found that "[a] reasonable jury could find that Moving Defendants did not make reasonable efforts to obtain the facts, where they either completely failed to inquire as to the reason for the altercation, or did so in a manner that failed to uncover relevant facts witnessed by no less than four individuals." *Stratienko*, 2008 WL 4191275, at *4. We find *Stratienko* to be distinguishable from the present case. *Stratienko* concerned an altercation between two doctors that did not directly involve any patients. *Id.* at *1. The court specifically found that the "imminent danger" exception in § 11112(c)(2) did not apply. *Id.* at *4 n.5. Moreover, there was evidence from which a reasonable jury could find that the hospital failed to inquire about the reasons for the altercation or failed to uncover readily available facts. *Id.* at *4. At the fair hearing in the present case, Dr. Webber described his reasoning when presented with the request to investigate Dr. Eluhu's actions:

> Well, I had felt that because [of] the seriousness of the allegations that John Keyser had raised, and because of the seriousness of the types of problems that had happened in two critically ill people, I felt that it would be really more than the vice-chair could sort out by doing the usual peer review directly. To me it looked like in a hurry was going to be a situation covered in vagary and very complex, and I thought immediately that an ad hoc committee would be the best way to try to sort it out in an unbiased way.
> . . . .
> I thought, again, that the seriousness of the two complications, the allegations that had been raised, the timing, both of them occurring within 24 hours, both of them involving emergency room patients, which I thought was a little strange, as well, all of that to me signaled a red flag and indicated to me that something ought to be discontinued until we could sort it out further. So I had suggested that we suspend his privileges for admitting patients through the ER, because that was the avenue through which these patients came, that was the avenue through which these patients had surfaced.

Thus, Dr. Webber and Dr. Johnson decided that the situation implicated patient safety and that, due to the complexity of the issues, a sufficient investigation would require an ad hoc committee. The preponderance of the evidence does not contradict the presumption that Drs. Webber and Johnson performed an adequate preliminary investigation in light of the presence of a reasonable basis for fear of imminent danger to patients.

---

[6]As head of the MEC, Dr. Webber also appointed the AHC to further look into the allegations concerning Dr. Eluhu's actions in the two cases at issue.

As to the MEC's decision to summarily suspend all of Dr. Eluhu's hospital privileges, Dr. Eluhu asserts that "the undisputed evidence is that the MEC did nothing to obtain the facts of the matter except for review and discuss the AHC report for a mere twenty minutes." The AHC was a committee of the MEC and acted as an investigatory body. Based upon the report of the AHC, the MEC decided to summarily suspend all of Dr. Eluhu's hospital privileges and to recommend to the board of trustees that his privileges be permanently revoked. The MEC specifically cited "imminent danger to the health of such patients at Centennial" in its notice to Dr. Eluhu. Pursuant to the hospital's bylaws and consistent with the HCQIA, summary or immediate suspension may be warranted in cases where there is a reasonable concern regarding patient safety. *See* 42 U.S.C. § 11112(c)(2). Moreover, other courts have stated that, "[w]hen the issue subject to peer review only concerns a single incident, summary suspension will inherently require less intensive fact finding and data compilation than would be the case with a review of a physician's care over several years." *Johnson v. Christus Spohn*, No. C-06-138, 2008 WL 375417, at *8 (S.D. Tex. Feb. 8, 2008).

With respect to whether there were reasonable efforts to obtain the facts of the matter regarding the decision to permanently revoke Dr. Eluhu's privileges, Dr. Eluhu argues that it was inappropriate for the MEC to recommend permanent revocation based on the AHC report "without interviewing all sides." As stated above, the MEC relied in part on the fact finding conducted by the AHC. Moreover, the MEC's recommendation did not become a final decision until it was approved by the board of trustees. We must consider the totality of the process leading to the professional review action, not just a single step in the process. *See Curtsinger*, 2007 WL 1241294, at *9; *Poliner v. Texas Health Sys.*, 537 F.3d 368, 380 (5th Cir. 2008). Dr. Eluhu requested and received a fair hearing on his case, as well as review by the ARC and approval by the board of trustees. We find nothing in Dr. Eluhu's arguments to overcome the presumption that CMC undertook reasonable efforts to obtain the facts.

C. Adequate notice and hearing procedures or such other procedures as are fair.

With respect to summary suspensions, 42 U.S.C. § 11112(c)(2) allows "subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." Dr. Eluhu argues that "a jury could conclude that Centennial failed to provide adequate notice and hearing procedures with regard to the summary suspension [of ER privileges]" and that "a jury could reasonably conclude that Dr. Eluhu was not an imminent danger to anyone." As this case comes to us on summary judgment and with a presumption in favor of immunity, the question we must decide is whether, looking at the facts in the light most favorable to Dr. Eluhu, the evidence preponderates against the presumption that the hospital meets the requirements for immunity. The issue of whether the hospital qualifies for immunity is a question of law and may be decided by the court once the relevant facts are developed. *Bryan*, 33 F.3d at 1332.

Dr. Eluhu argues that "the actions of Drs. Johnson, Webber and Alford demonstrate rather conclusively that they did not hold [the opinion that Dr. Eluhu posed an imminent danger]" at the time when the summary suspension of ER privileges was imposed. The state of mind of the doctors

is not relevant. The reasonableness required under the HCQIA is evaluated under an objective standard. *Curtsinger*, 2007 WL 1241294, at \*6; *Singh*, 308 F.3d at 32; *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10ᵗʰ Cir. 1996).

Dr. Eluhu points to the time lag of four to five days between the initial incidents (on October 25 and 26) and the decision (on October 31); the limitation of the initial suspension to ER privileges; and the absence of grossly incompetent or abusive behavior by Dr. Eluhu as indications of the absence of imminent danger. We disagree. The incidents in question occurred over the weekend, and it took a few days for the peer review participants to receive and preliminarily evaluate Dr. Keyser's complaints. Dr. Webber's testimony indicates that the decision to impose a summary suspension limited to ER privileges was an attempt to address serious safety concerns while trying to be fair to Dr. Eluhu and confine the suspension to the specific area in which problems had been identified.[7] Dr. Eluhu cites Dr. Alford's testimony to support his assertion that "summary suspensions are normally reserved for situations in which there is very inappropriate behavior, abusive behavior, . . . apparent negligence or serious harm to the patient, 'psychiatric behavior,' alcohol and 'that type of thing.'" Even assuming that this assertion is factually accurate, the language of the summary suspension provisions of the hospital's bylaws and the HCQIA are broad enough to include any action that "may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2); *see Poliner*, 537 F.3d at 382.

We turn now to Dr. Eluhu's objections to the notice with respect to the permanent revocation of his hospital privileges. Dr. Eluhu argues that, after the AHC submitted its report to the MEC, he was not informed that the AHC had identified additional quality of care concerns that were being evaluated by the MEC. Even if Dr. Eluhu was not aware of the additional quality of care concerns until the MEC issued its report, however, this fact would not negate HCQIA immunity. Dr. Eluhu was informed of the quality of care issues prior to the hearing concerning the permanent revocation of privileges. We look at the totality of the process leading up to a professional review action, not to each professional review activity along the way. *See Curtsinger,* 2007 WL 1241294, at \*6; *Bryan*, 33 F.3d at 1334; *Fobbs v. Holy Cross Health Sys. Corp.*, 789 F. Supp. 1054, 1065 (E.D. Cal.1992). Moreover, the legislative history of the HCQIA includes statements contemplating the uncovering of new problems during the investigation leading up to a professional review action:

> The Committee is aware that between the time the initial notice is given of a proposed professional review action and the time of the hearing on that action, the investigation may have uncovered reasons for such an action other than or in addition to the reasons specified in the initial notice. Provided that notice is given in a way that protects the interests of the physicians against whom the action is proposed, a supplemental notice of such additional reasons might well satisfy the requirements of due process.

---

[7] At the hearing, Dr. Webber testified: "[A]s a cardiologist, who has had complications like the rest of us, my concern was, you know, is this just coincidental and bad luck on Dr. Eluhu's part or is there some sort of pattern that we need to look at more explicitly."

16

H.R. R̲ᴇᴘ. N̲ᴏ. 99-903, at 11, *reprinted in* 1986 U.S.C.C.A.N. 6384, 6394; *see also Fobbs,* 789 F. Supp. at 1068.

The HCQIA contains a "safe harbor" provision under which "[a] health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3)" if certain conditions are met. 42 U.S.C. § 11112(b). Those conditions are described in detail at 42 U.S.C. § 11112(b). While acknowledging that CMC adhered to many of the requisite conditions, Dr. Eluhu asserts that the hospital failed to "meaningfully comply" with § 11112(b)(1)(A)(ii), which requires that the physician receive notice stating "reasons for the proposed action." We cannot agree. In addition to the MEC report, Dr. Eluhu received detailed letters from CMC's attorneys advising him of the issues to be addressed at the hearing, including quality of care issues, his history at CMC, and the complication rate data. Dr. Eluhu argues that it was fundamentally unfair for the fair hearing panel to make a decision based upon issues not considered by the MEC. Dr. Eluhu focuses his inquiry at the MEC level instead of looking at the totality of the process. As stated above, the investigatory process may uncover additional problems. As long as the physician has a chance to prepare for those issues and present his position at the fair hearing, the process comports with § 11112(b)(1)(A)(ii). It is worth noting that Dr. Eluhu did not request a continuance of the hearing to allow him to address any new issues.

Dr. Eluhu has failed to overcome the presumption that the hospital complied with the safe harbor notice and procedure requirements.

D. Reasonable belief that action warranted by facts known after reasonable effort to obtain the facts and after meeting the requirements of paragraph (3).

The analysis regarding this fourth requirement "closely tracks our analysis under § 11112(a)(1)." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 471 (6th Cir. 2003) (quoting *Gabaldoni v. Washington County Hosp. Ass'n*, 250 F.3d 255, 263 n.7 (4th Cir. 2001)). And Dr. Eluhu has not presented any additional arguments with respect to this criterion.

We conclude that Dr. Eluhu has failed to overcome the presumption of immunity in this case. The alleged factual disputes on which he relies go to the medical judgments reached by CMC in the peer review process, not to the adequacy of the process itself. We therefore further conclude that the trial court properly granted summary judgment on all claims for monetary damages based upon the hospital's peer review activities.

Dᴇᴄʟᴀʀᴀᴛᴏʀʏ ᴀɴᴅ Iɴᴊᴜɴᴄᴛɪᴠᴇ Rᴇʟɪᴇꜰ

After the trial court granted CMC's motion for summary judgment regarding damage claims for actions taken as part of the peer review process, the court granted the hospital's motion for

17

summary judgment on the remaining claims for injunctive or declaratory relief.[8] In contrast to the presumption applicable with respect to HCQIA immunity, these claims for equitable relief are subject to the normal summary judgment standard: the moving party bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. *Godfrey*, 90 S.W.3d at 695. In making this determination, we take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.*

A. Breach of contract.

Dr. Eluhu's main claim is that CMC breached its contract with Dr. Eluhu by violating its bylaws. Our Supreme Court has recognized that a hospital's bylaws constitute "an integral part of its contractual relationship with the members of its medical staff." *Lewisburg Cmty. Hosp., Inc. v. Alfredson*, 805 S.W.2d 756, 759 (Tenn. 1991); *see also Gekas v. Seton Corp.*, No. M2006-00454-COA-R3-CV, 2008 WL 836399, at *6 (Tenn. Ct. App. Mar. 28, 2008). The hospital has a contractual obligation to follow its bylaws. *Lewisburg*, 805 S.W.2d at 759. In such cases, this court has adopted a standard of substantial compliance: "if the hospital has substantially complied with the requirements of its bylaws, then it has met its contractual obligation." *Gekas*, 2008 WL 836399, at *7.

The substantial compliance standard provides for limited judicial review. *Id.* We have described the courts' role as follows:

> [T]heir role is not to reweigh the evidence and substitute their own judgment for that of the hospital, but only to determine if the hospital has substantially complied with its bylaws and given the affected party adequate notice and the opportunity for a fair hearing before an impartial tribunal.

*Id.* Such deference reflects "the general unwillingness of courts to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." *Mahmoodian v. United Hosp. Ctr., Inc.*, 404 S.E.2d 750, 756 (W. Va. 1991). Even if the hospital has substantially complied with the bylaws procedures, a court may examine the evidence "to the degree necessary to determine whether the hospital's decision was arbitrary, capricious or unreasonable." *Gekas*, 2008 WL 836399, at *11.

Dr. Eluhu asserts nine bases to support his argument that CMC failed to substantially comply with the bylaws:

1. Section 10.2 of the bylaws: requests for corrective action in writing.

---

[8]The immunity provided under the HCQIA does not cover injunctive or declaratory relief. 42 U.S.C. § 11111(a)(1); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 605 (4th Cir. 2009). The same is true of the Tennessee Peer Review Law. *Eyring v. Fort Sanders Parkwest Med. Ctr., Inc.*, 991 S.W.2d 230, 236 (Tenn. 1999).

18

Section 10.2 of CMC's bylaws, part of Article I on corrective action, sets forth the procedure for initiating a corrective action and provides, in pertinent part:

> All requests for corrective action shall be in writing and shall be made to the MEC. Such requests for corrective action shall be supported by reference to the specific activities or conduct, which constitute the grounds for the requested corrective action.

The evidence does not show that this procedure was followed in this case.[9] Rather, the first written statement concerning the case appears in a letter written by Dr. Johnson, MEC chair, to Dr. Webber, chair of the cardiovascular medicine department. In that letter, dated October 30, 2003, Dr. Johnson stated that Dr. Keyser raised concerns "including but not limited to" the following:

- Lack of Dr. Eluhu's availability and direction for staff caring for patients having complications of procedures performed by Dr. Eluhu

- Failure of Dr. Eluhu to provide appropriate physician-to-physician communication in requesting consultation to assist in managing major complications

Dr. Johnson directed Dr. Webber to form an ad hoc committee to investigate.

CMC argues that this procedure was not applicable because the inquiry began as a summary suspension. Section 10.1 of the bylaws is titled "Criteria for Initiating an Investigation for Possible Corrective Action Other than Summary or Automatic Suspension." Section 10.2 is titled "Procedure," and Section 10.3 is titled "Summary Suspension." All of these sections are part of Article X: Corrective Action. According to CMC's interpretation, Sections 10.1 and 10.2 both apply only to corrective action other than summary or automatic suspension. While the interpretation urged by CMC does not necessarily follow from the organization of Article X or the language of Section 10.2, we find that this construction is the most logical interpretation in light of the provisions of Section 10.3 on summary suspension.

Section 10.3 of CMC's bylaws authorizes any two of "the Chair of the MEC (Medical Staff President), Department Chief, the Medical Center President, the MEC or the Trustees" to summarily suspend any of a practitioner's clinical privileges under certain circumstances, and the summary suspension "shall become effective immediately." The practitioner is then entitled to request a hearing on the summary suspension. Thus, a summary suspension does not necessarily involve the MEC. A department chief and the MEC chair may, as in the present case, make a joint decision that summary suspension is warranted. Under those circumstances, requiring initiation of the process

---

[9]Dr. Alford testified that he thought he had written a letter to Dr. Johnson or Dr. Webber concerning Dr. Keyser's concerns, but no such letter was ever produced.

19

through a written report to the MEC would be superfluous.[10]  Summary suspension is designed to be an immediate action subject to later presentation to and consideration by the MEC.

In his reply brief, Dr. Eluhu states that he "does not argue that Sections 10.1 and 10.2 governed the summary suspension, but he does contend that those sections governed the process, initiated by Dr. Johnson's October 30 letter specifically invoking Section 10.2, that led to his ouster from the hospital."  Given this concession that §§ 10.1 and 10.2 do not govern summary suspension, we find no real issue here.  As will be further explained below in our discussion of particular arguments made by Dr. Eluhu, we find nothing to indicate that the hospital failed to substantially comply with these sections in permanently revoking his staff membership.

2.  Section 10.3(A) of the bylaws: imminent danger.

Section 10.3(A) authorizes certain hospital officials to summarily suspend a practitioner "whenever failure to take such an action may result in an imminent danger to the health of any individual."[11]  Dr. Eluhu argues that summary judgment was improper because there is an issue of material fact "as to whether Centennial's agents actually and in good faith believed that Dr. Eluhu posed an imminent danger to anyone."  In support of this argument, Dr. Eluhu cites the same three factors addressed above–the time lag of four to five days between the initial incidents and the initial summary suspension; the limitation of the initial suspension to ER privileges; and the absence of grossly incompetent or abusive behavior by Dr. Eluhu.

Dr. Eluhu essentially challenges the hospital's implicit determination that failure to impose a summary suspension might result in "imminent danger to the health of any individual."  This is the type of medical judgment for which we are loathe to substitute our judgment for that of the hospital.  For the reasons discussed above, we do not find the three factors cited by Dr. Eluhu to be persuasive.  Moreover, Dr. Eluhu has not cited, and we do not find, any evidence that the hospital's decision to proceed under the summary suspension provisions was arbitrary, capricious, or unreasonable.

3. Section 12.6 of the bylaws: scope of ad hoc committee's work.

Section 12.6 of the bylaws authorizes the appointment of ad hoc committees and provides that such committees "shall confine their work to the purposes for which they were appointed and shall report back to the MEC."  Dr. Eluhu argues that the AHC violated section 12.6 by going beyond the specific concerns described in Dr. Johnson's letter and identifying additional quality of

---

[10] Dr. Eluhu argues that "Section 10.2's requirement that a request for corrective action specifically identify the activity or conduct at issue is clearly intended to define the scope of the inquiry and allow all participants to know what is at issue so that they may act accordingly."  Although we have concluded that Section 10.2 does not directly apply here, we note that this argument will be addressed below.

[11] The summary suspension language of 42 U.S.C. § 11112(c), which contemplates summary suspension "where the failure to take such an action may result in an imminent danger to the health of any individual," mirrors the language used by CMC in its bylaws.

20

care concerns. We disagree with this analysis. The AHC was tasked to investigate and evaluate potential problems regarding Dr. Eluhu's treatment of two patients. Dr. Johnson's letter expressly did not limit the AHC's work to the two specific issues he described. Moreover, we see nothing in the bylaws that would preclude the AHC from uncovering related problems in the course of its investigation. *See Gekas,* 2008 WL 836399, at *10.

Dr. Eluhu asserts that allowing the consideration of these "new" issues (instead of referring them to the cardiovascular department for separate peer review) is a denial of due process because "the Fair Hearing procedure is the last resort for a physician and clearly presents an uphill battle." We conclude, however, that as long as Dr. Eluhu had adequate notice and opportunity to address the issues at the hearing, there is no violation of due process. *See id.*; *see also Johnson v. Spohn*, No. 08-40262, 2009 WL 1766557, at *8-9 (5th Cir. June 23, 2009); *Fobbs*, 789 F. Supp. at 1068.

4. Section 10.2(C) of the bylaws: notice and opportunity to respond to AHC.

Section 10.2(C) provides, in pertinent part, as follows:

> As soon as possible after receipt of the request for corrective action, the department shall make a report of its investigation to the MEC. Prior to making such a report, the practitioner against whom corrective action has been requested shall have an opportunity for an interview with the Ad Hoc Investigating Committee. At this interview the practitioner shall be informed of the general nature of the charges against him/her and shall be invited to discuss, explain or otherwise refute such charges. The interview shall not constitute a hearing, but shall be preliminary in nature and none of the procedural rules provided by these Bylaws with respect to hearings and protocol shall apply.

Dr. Eluhu avers that he was not properly informed of the issues to be addressed when he met with the AHC. According to Dr. Eluhu, he was told only that he would be "asked about his interactions with Dr. Keyser, and possibly the nurses" and therefore "was not prepared to talk in detail about his care of Ms. B and Ms. F, having recently returned from his father's funeral in Africa." Dr. Eluhu further asserts that the AHC did not question him about all of the concerns included in the report by Dr. Seitz, the AHC chair.

We find no merit to this argument. The letter sent to Dr. Eluhu on October 31, 2003, informed him that his ER call had been summarily suspended "[b]ecause of concerns regarding complications arising in two of your patients who underwent emergency catheterizations on October 25/26, 2003." Dr. Eluhu admits that the AHC asked him to give a narrative of his treatment of these two patients and questioned him about Ms. F's bradycardic episode. Section 10.2(C) specifically states that the physician under review must be informed at the AHC interview of the "general nature of the charges" and that the ad hoc proceedings "shall not constitute a hearing, but shall be preliminary in nature and none of the procedural rules provided by these Bylaws with respect to

hearings and protocol shall apply." Moreover, prior to the hearing, Dr. Eluhu was informed in detail of the hospital's position and the issues to be addressed.

5. Section 10.2(C) of the bylaws: record of interview.

Section 10.2(C) further provides that a record of the AHC interview "shall be made by the department and included in the above-mentioned report presented to the MEC." Dr. Eluhu takes the position that this section was violated because the AHC's report does not reference any discussion with Dr. Eluhu regarding the "new" quality of care issues, a discussion he claims never occurred. Section 10.2(C) requires a record of the AHC interview; it does not contain any requirements with regard to the interview or the nature of the report. According to Dr. Eluhu, it was essential for the AHC to discuss these "new" issues with him and to document that discussion so that the MEC would know his responses. Based upon the language of Section 10.2(C) and the investigatory nature of the AHC interview, we find no merit to this position. Dr. Eluhu was fully informed of these concerns prior to his fair hearing and had a chance to address them.

6. Section 12.1(C)(8) of the bylaws: MEC's duty to review all available information.

Section 12.1(C)(8) appears in a list of MEC duties and requires the MEC to "review, as may be indicated, all information available regarding the performance and clinical competence of Staff members and as a result of such reviews, to make recommendations for reappointments and renewals and changes in clinical privileges." Dr. Eluhu emphasizes the AHC report's statement that "further evaluation of the serious quality of care issues raised by Dr. Eluhu's management of these patients is warranted." In his view, this recommendation should have prompted the MEC to conduct further investigation. Instead, based upon the MEC report and its own discussion of the issues presented, the MEC voted to summarily suspend all of Dr. Eluhu's privileges and to recommend to the board of trustees revocation of his medical staff membership. While it certainly would have been within the MEC's discretion to conduct further investigation, we see nothing in the bylaws requiring it to do so.

7. Section 1.3 of the fair hearing plan.

Section 1.3 of CMC's fair hearing plan provides as follows:

A practitioner against whom an adverse recommendation or action has been taken pursuant to Section 1.2 of this Plan shall promptly be given special notice of such action and the grounds upon which the adverse action is based. Such notice shall:

(a) Advise the practitioner of his right to a hearing pursuant to the provisions of the Medical Staff Bylaws and of this Fair Hearing Plan.

(b) Receipt of notice within which a request for hearing must be submitted.

22

(c) State that failure to request a hearing within a specified time period shall constitute a waiver of rights to a hearing and to an appellate review on the matter.

Dr. Eluhu's argument is that he "had no idea why the MEC had taken such drastic action, and Dr. Johnson's letter [of December 10, 2003] did not inform him as required by Section 1.3." We disagree. In the December 10, 2003 letter, Dr. Johnson cited "inadequate performance and judgment resulting in patient harm in the two cases at issue" as well as "earlier instances of questionable patient care." In their letter of October 31, 2003, Drs. Johnson and Webber referenced "complications arising in two of your patients who underwent emergency cardiac catheterizations on October 25/26, 2003." Based upon these two letters, Dr. Eluhu knew the two cases in question.

As to the other patient care issues identified by the AHC, it appears that Dr. Eluhu did not receive a copy of the AHC report until a few weeks after the December 10, 2003 letter. It is undisputed, however, that Dr. Eluhu did receive a copy of that report before December 31, 2003. Furthermore, he and his attorneys thereafter received more information about the issues to be addressed at the fair hearing, most notably a letter dated February 12, 2004, that included a detailed outline. The hearing began on February 24, 2004, and Dr. Eluhu did not request a continuance to prepare his response to any "new" information.

Dr. Eluhu argues that it was improper for the hospital to rely on information that did not form part of the basis for the MEC's decision, such as the complication data, in making its case at the fair hearing. He cites no authority to support this argument, and we have rejected the same proposition in our discussion above. We believe Dr. Eluhu received prompt notice of the general grounds upon which the adverse action was based and adequate notice of issues to be addressed at the fair hearing.

8. Section I(10) of the medical staff rules and regulations.

Under Section I(10) of the hospital's medical staff rules and regulations, a section outlining the guidelines for peer review of quality of care, "[p]rior to any action or severity assignment, the individual being evaluated shall be given the opportunity to present his/her position in person to the departmental chairman and/or ad hoc departmental quality review committee." The hospital does not dispute the fact that Dr. Eluhu was not given the opportunity to talk to the department chair or quality review committee prior to the assignment of severity ratings. CMC's quality management department referred the cases to Dr. Sikes, a cardiologist, on December 17, 2003, and he made the assignment of severity ratings. (Dr. Sikes was also a member of the AHC.) Dr. Eluhu was not given the opportunity to meet with Dr. Sikes before the severity rating assignments. The hospital emphasizes that Dr. Eluhu presented his position to the AHC, which last met on December 4, 2007. While we do not consider Dr. Eluhu's appearance before the AHC to satisfy the requirements of Section I(10), we do not view this violation of the rules as amounting to a failure to substantially comply with the bylaws. Dr. Eluhu has not identified any way in which this deviation from the rules prejudiced him.

9. Section 3.7 of the fair hearing plan.

Section 3.7 of the hospital's fair hearing plan addresses the burden of proof and provides, in pertinent part, that the MEC "shall have the initial obligation to present evidence" in support of its adverse action. Dr. Eluhu cites statements in the FHC's report that "the evidence presented to the Hearing Panel was much more extensive than that presented to the MEC when it made its recommendation" and that "the investigation into the facts performed by the attorneys for the parties was more extensive than the investigation performed by the Ad Hoc Committee which reported to the MEC." According to Dr. Eluhu's argument, Section 3.7 should be interpreted to require that the MEC must "present evidence of the actual reasons they took the action, not evidence gathered after the fact by its lawyers to support the position."

For the same reasons discussed above, we reject this reasoning. We agree with the trial court's conclusion that "Dr. Eluhu's desire to limit the proof and the investigation has no basis in the Bylaws, so long as Dr. Eluhu was advised of the grounds upon which his privileges were suspended and then terminated."

The trial court did not err in granting summary judgment on Dr. Eluhu's claims for breach of contract.

B. Other causes of action.

In addition to his cause of action for breach of contract, Dr. Eluhu asserted causes of action for breach of the implied duty of good faith and fair dealing, defamation, common law disparagement, statutory disparagement, and intentional interference with existing and prospective business relationships. He argues on appeal that the trial court erred in dismissing his claims for equitable relief under these causes of action. CMC counters that the remaining causes of action "were contingent upon Dr. Eluhu establishing a breach of contract or establishing that Centennial acted in bad faith and malice during the peer review proceedings" and that there are no genuine issues of material fact as to these remaining causes of action set forth in the complaint.[12]

Dr. Eluhu acknowledges that the trial court summarily dismissed these additional causes of action in its order and memorandum but assigns error to the trial court's failure to identify any reasons for this disposition. We are inclined to agree with Dr. Eluhu. While the trial court carefully addressed all of Dr. Eluhu's arguments regarding his breach of contract claims, the court's memorandum and order does not discuss or even mention the other causes of action. Effective July 1, 2007, Tenn. R. Civ. P. 56.04 provides: "The trial court shall state the legal grounds upon which the court denies or grants the motion [for summary judgment], which shall be included in the order reflecting the court's ruling." Without such a statement, as in the present case, a reviewing court is

---

[12] This court notes that some of the factual allegations underlying Dr. Eluhu's remaining causes of action–for example, his claims based upon statements allegedly made by Dr. Alford to another hospital–reference actions taken outside of the peer review process.

left to wonder on what grounds the trial court granted the motion for summary judgment. We therefore vacate and remand the trial court's decision to grant summary judgment with respect to Dr. Eluhu's additional claims for equitable relief (meaning those claims not based upon breach of contract).

TEMPORARY INJUNCTION

Dr. Eluhu also assigns error to the trial court's decision, in March 2007, to deny his application for a temporary injunction to compel CMC to reinstate his privileges and to revise or retract its report to the national data bank. We review a trial court's decision to issue or not to issue injunctive relief under an abuse of discretion standard. *See Medtronic, Inc. v. NuVasive, Inc.*, No. W2002-01642-COA-R3-CV, 2003 WL 21998480, at *10 (Tenn. Ct. App. Aug. 20, 2003); *Bd. of Comm'rs*, 88 S.W.3d at 919.

Tenn. R. Civ. P. 65.04(2) provides for the issuance of a temporary injunction when "the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action." Courts consider four factors when deciding whether to grant a preliminary injunction: "(1) the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest." *Moody v. Hutchison*, 247 S.W.3d 187, 199-200 (Tenn. Ct. App. 2007). The trial court considered each of these factors in its order denying Dr. Eluhu's application for injunctive relief:

> This Court finds, based on all the materials reviewed as well as review of the relevant case law, that it is unlikely that Dr. Eluhu will be successful on the merits of this case. . . . Although the Court finds that there is irreparable harm to Dr. Eluhu's reputation and his ability to earn money given his speciality of cardiology which must rely on referrals, when this harm is balanced against the harm to the hospital and the public interest in having a physician practicing on its staff that the hospital has concluded does not have the skills that are needed to practice there and that patients may be harmed, the Courts finds that the public interest will not be served by the issuance of an injunction.

We conclude that the trial court properly exercised its discretion in denying Dr. Eluhu's request for a temporary injunction.[13]

---

[13] Relying on *Early v. Bristol Memorial Hospital, Inc.*, CMC argues that temporary injunctive relief is not available as a remedy under Tennessee law for physicians seeking reinstatement of revoked hospital privileges. *Early*, 508 F. Supp. 35 (E.D. Tenn. 1980). Given our determination that the trial court did not err in denying a temporary injunction to Dr. Eluhu in this case, we decline to consider this issue.

CONCLUSION

We reverse and remand the trial court's decision to grant summary judgment with respect to Dr. Eluhu's claims for injunctive relief not based upon breach of contract. With respect to all other claims, including monetary damages and injunctive relief for breach of contract, we affirm the trial court's decision. Costs of appeal are assessed against the appellant, Dr. Eluhu, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE